In re Gregory C. SENESE, Debtor.

Petra Neugebauer, a creditor, Plaintiff,

v.

Gregory C. Senese, Defendant.

Bankruptcy No. 98 B 39444.
Adversary No. 99 A 00704.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 6, 2000.

Robert J. Peters, Brown, Udell & Pomerantz, Ltd., Chicago, IL, for Plaintiff.

Frank J. Ryan, Ryan, Frost & Bijak, Oak Forest, IL, for Defendant.

Eugene Crane, Dannen, Crane, Heyman, Chicago, IL, trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Following entry of default order against Defendant and prove-up by Plaintiff through her attorney's Memorandum filed appending Defendant's deposition and Plaintiff's Affidavit, based thereon the Court now makes and enters the following Findings of Fact and Conclusions of Law, pursuant to which separate judgments will enter against the Defendant on Counts I and II of the Adversary Complaint herein.

1. The Findings of Fact and Conclusions of Law contain references to certain matters of record in these proceeding which are identified and referred to in abbreviated forms: Plaintiff's Complaint Objecting to Discharge of Debtor and to Dischargeability of Debt

## FINDINGS OF FACT [1]

### Objection To Discharge—11 U.S.C. § 737—Count I

1. On December 9, 1998 the Debtor filed a Voluntary Petition pursuant to Chapter 7 of the Bankruptcy Code, including Schedules and a Statement Of Financial Affairs. In this filing, and in writing, the Debtor declared under penalty of perjury that the information contained in his Petition was true and correct.

2. Plaintiff is the largest unsecured creditor of Debtor. Her claim was scheduled in the amount of $24,756 as disputed.

3. Schedule B to the Debtor's Petition at item 23 required disclosure of the Debtor's interest in "Automobiles, trucks, trailers and other vehicles and accessories." Debtor described such property as including only a 1995 Mercury Cougar, then having a market value of $9,000.00.

4. Debtor's Statement of Financial Affairs, at item 2, required disclosure of income of the Debtor received during the two years immediately preceding the commencement of this Chapter 7 case, other than income received from the Debtor's employment, trade, profession, or operation of the Debtor's business. The Debtor's response to said request for information was "None".

5. Debtor's Statement of Financial Affairs, at item 10, required disclosure of all other property of the Debtor, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this Chapter 7 case. The Debtor's response to said request for information was "None". Despite this sworn statement, upon ques-

("Complaint"); the transcript of the Bankruptcy Rule 2004 deposition of the Debtor/Defendant ("2004 Dep."); the Affidavit of Plaintiff Petra Neugebauer ("Pl.Affid."); and exhibits to that Affidavit ("Gr. Exh." or "Exh.").

tioning by the Plaintiff's counsel at his Rule 2004 examination, the Debtor admitted having an ownership interest in those vehicles identified in paragraphs 6 through 12 immediately below. (2004 Dep., pp. 12–13)

6. The records of the Secretary of State of Illinois disclose that at the time of commencement of this Chapter 7 case, the Debtor owned a 1989 Pontiac Firebird automobile, VIN number 1G2FS2182KL246154 ("Pontiac"). (Pl. Affid., ¶ 23 and Gr. Exh. D) Said automobile was not scheduled as an asset of the Debtor in Schedule B to his Petition. Upon examination under oath by Plaintiff's attorney at his Rule 2004 examination on May 25, 1999, the Debtor testified that said vehicle had been sold, but he could not recall when it was sold, or for what sum. (2004 Dep., pp. 21–22)

7. The records of the Secretary of State of Illinois disclose that at on or about December 15, 1998, six days after the commencement of this Chapter 7 case, the Debtor transferred his interest in that Pontiac to a third person. (Pl. Affid., ¶ 23 and Gr. Exh. D)

8. The records of the Secretary of State of Illinois also disclose that at the time of commencement of this Chapter 7 case, the Debtor owned an interest in a 1996 Suzuki GSX60OF motorcycle, VIN number JS1 GW72A,7T2102705. (Pl. Affid., ¶ 23 and Gr. Exh. D) Said motorcycle was not scheduled as an asset of the Debtor in Schedule B to his Petition.

9. The records of the Secretary of State of Illinois disclose that at the time of commencement of this Chapter 7 case, the Debtor owned an interest in a 1986 Pontiac Sunbird automobile, VIN number 1 G2JD2709G7586035 ("'86 Sunbird"). (Pl. Affid., ¶ 23 and Gr. Exh. D) Said automobile was not scheduled as an asset of the Debtor in Schedule B to his Petition. Upon examination under oath by Plaintiff's attorney at a Rule 2004 examination on May 25, 1999, the Debtor testified that the '86 Sunbird had been sold in March 1998, and that he didn't know the buyer's name. (2004 Dep., p. 13)

10. The records of the Secretary of State of Illinois disclose that at the time of commencement of this Chapter 7 case, the Debtor owned a 1988 Chrysler Lebaron automobile, VIN number 1C3RJ55E1JG08363 ("Chrysler"). (Pl. Affid., ¶ 23 and Gr. Exh. D) Said automobile was not scheduled as an asset of the Debtor in Schedule B to his Petition. Upon examination under oath by Plaintiff's attorney at a Rule 2004 examination on May 25, 1999, the Debtor testified that the Chrysler had recently been sold in 1999. (2004 Dep., p. 16)

11. The records of the Secretary of State of Illinois disclose, and the Debtor's testimony at his Rule 2004 examination confirms, that from April 1997 to March 1998, the Debtor owned a 1990 Pontiac Sunbird automobile, VIN number 1G2JD14K3L7594335 ("'90 Sunbird"); and the Debtor transferred title in the same to a third party on March 27, 1998. (Pl. Affid. ¶ 23 and Gr. Exh. D; 2004 Dep., p. 15)

12. Proceeds of sales of said the '86 Sunbird and '90 Sunbird were not disclosed as having been received by Debtor within the two-year period prior to the commencement of this Chapter 7 case at item 2 of the Debtor's Statement Of Financial Affairs, nor was this transfer of ownership of the automobiles disclosed at item 10 of the Debtor's Statement Of Financial Affairs.

13. Upon examination under oath by Plaintiff's attorney at his Rule 2004 examination, the Debtor admitted receiving income from the rental of his personal residence during the period December 1996 to March 1997. He acknowledged said rental income in his deposition at $900.00 per month (2004 Dep., pp. 25–26). However, that rental income was not disclosed as income received by the Debtor within the two-year period prior to the commencement of this Chapter 7 case at item 2 of

the Debtor's Statement of Financial Affairs.

14. During the two-year period prior to commencement of this Chapter 7 case, the Debtor engaged in gambling and received income from gambling. He placed bets on sporting events through a third party named "Frankie"; he engaged in off-track horse race betting; and he gambled at riverboat casinos. He won as much as $1,200.00 at one time at the riverboat casinos, and he told the Plaintiff that he "did well" in his gambling. (Pl.Affid., ¶ 22) Said gambling income was not disclosed as income received by the Debtor within the two-year period prior to the commencement of this Chapter 7 case at item 2 of the Debtor's Statement Of Financial Affairs. When questioned about the gambling at his Rule 2004 examination, he could only state that he could not recall whether he gambled within the past two years, or within the past five years. (2004 Dep., p. 42)

15. At his first meeting of creditors in this Chapter 7 case, on January 25, 1999, the Debtor reaffirmed under oath that the statements made in his Petition were true and correct.

16. Plaintiff examined the Debtor under oath before filing this Adversary case at an examination on May 25, 1999, taken under Rule 2004 F.R.Bankr.P. In connection with such examination, the Debtor was requested (2004 Dep., Exh. A) to produce for inspection at the time of the examination the following documents, *inter alia:*

a. Documents relating to the acquisition, financing, sale, ownership, maintenance, possession and use of the motor vehicles described above;

b. Documents relating to the Debtor's income and expense associated with his rental of his townhome in 1996 and 1997;

c. All checking and savings account records, for any account in which the Debtor had an interest, including with-out limitation deposit slips, canceled checks, check registers and account statements, for the years 1996, 1997 and 1998; and

d. Account statements and other documents (including without limitation purchase, charge, or cash transfer or debit receipts), relating to credit card or other accounts in which the Debtor had any interest, for the years 1996, 1997 and 1998, including without limitation those twelve credit accounts identified in Schedule F to his bankruptcy Schedules.

17. In response to those demands for production, the Debtor produced only the following:

a. One single item of correspondence or account statement for each of fifteen credit accounts, all dated sometime in the Fall of 1998 shortly before the filing of his Petition in this case (2004 Dep., Exh. B);

b. A monthly statement from the Internal Revenue Service dated October 14, 1998 regarding an installment payment on calendar 1996 and 1997 1040 liabilities (2004 Dep., Exh. B);

c. One monthly checking account statement, covering the post-Petition period January 18 to February 18, 1999 (2004 Dep., Exh. B); and

d. A copy of the title to the 1996 Suzuki motorcycle (2004 Dep., Exh. D) that had not been disclosed in the bankruptcy filings.

During his Rule 2004 examination Debtor testified under oath that the documents so produced by him were the only documents he possessed which the request to produce covered. (2004 Dep., p. 2 *et seq.)* He further testified that he had read the notice of the Rule 2004 examination prior to that examination, and that he had made an investigation to determine whether any documents requested therein were in his possession. (2004 Dep., pp. 10–11)

18. During his Rule 2004 examination, the Debtor was unable to identify any item purchased on any credit card account

scheduled in his bankruptcy Schedule F, except to state that all purchases made on those accounts were confined to purchases of "consumables", or for everyday expenses such as food and utilities, and that he had no recollection of purchasing any non-"consumable" tangible personal property with those credit cards, which had an aggregate balance in excess of $30,000.00. (2004 Dep., pp. 28–39)[2] He also could not recall whether he took any cash advances on those accounts, or when he had acquired the credit cards. (2004 Dep., pp. 28–39) The Debtor also could not explain why a debt to Credit Union One, scheduled in the amount of $8,285.00, was described as a "miscellaneous loan." (2004 Dep., pp. 33–34) Although the Debtor denied purchasing any non-"consumables" with any of the credit cards, three of those scheduled credit card account debts, aggregating $10,816.00, were maintained with retailers (J C Penney, Montgomery Ward and Sears). Additionally, the Debtor's income and expense disclosures in Schedule I to his Petition shows a monthly shortfall of expense over earned income of less than $500.00 per month, and the expense portion of these statements presumably includes expenses paid from earned income which would include the "consumables" to which the Debtor testified. But it was not explained how or why the Debtor incurred his total credit card debt in excess of $42,000.00 for items charged to his cards.

### Dischargeability Of Debt—11 U.S.C. § 523—Count II

19. In the Summer of 1995, Plaintiff and Debtor decided to purchase a single family residence located at 11693 Mark Lane, Orland Park, Illinois (the "Residence"), in which Plaintiff, Debtor/Defendant, and Debtor's four children were to reside. (Pl.Affid., ¶ 2)

2. Although his three children, ranging in age from the late teens to the early twenties, lived with him, the Debtor testified at his Rule 2004 examination that they purchased their own items of personal property, such as stereo

20. At that time, and afterwards at times mentioned herein, Debtor owned in his own name a townhouse located at 9317 West 142nd Street, Orland Park, Illinois (the "Townhouse"). (Pl.Affid., ¶ 3)

21. Prior to contracting to purchase the Residence, Plaintiff and Debtor entered into a verbal agreement to (i) purchase the Residence by equal contributions of moneys and credit to effect such purchase, (ii) hold legal title to the Residence jointly and in equal shares, and (iii) share equally in the payment of those costs and expenses incident to their continued ownership and maintenance of the Residence ("agreement"). (Pl.Affid., ¶ 4)

22. (a). Pursuant to and as a consequence of this agreement, Plaintiff and Debtor contracted to purchase the Residence for the gross purchase price of $196,000.00. The Debtor advised the Plaintiff that he would fund his share of the expense of purchasing the Residence from proceeds of his sale of the Townhouse. (Pl.Affid., ¶ 5)

(b). At that time, the Debtor had advised the Plaintiff that the Townhouse had been purchased for $115,000.00. He did not advise the Plaintiff of the amount of the debt secured by the mortgage on the Townhouse, or that his equity in the Townhouse was insufficient to fund that portion of the necessary cash costs that he had agreed to pay incident to purchase of the Residence, nor did she otherwise have knowledge of such facts. In entering into her agreement with the Debtor, the Plaintiff reasonably and justifiably relied upon the Debtor's promise of funding one-half of the cash costs incident to the purchase of the Townhouse, and upon the Debtor's representations that such sums would be available to the Debtor upon his sale of the Townhouse. (Pl.Affid., ¶ 8)

equipment, clothing, or "anything of that nature." (2004 Dep., pp. 29–30) He claims that he provided them only with food and lodging. (2004 Dep., pp. 29–30)

572

(c). In fact, the Debtor did not then have sufficient equity in his Townhouse to generate the promised portion of the cash costs for purchase of the Residence. His Petition in this proceeding scheduled the Townhouse in December 1998 as then having a market value of $118,000.00, burdened by secured debt in the amount of $108,000.00. Therefore, three years after Debtor/Defendant's original promise and representation, he still lacked equity sufficient to fulfill his 1995 promise.

23. When these parties contracted to purchase the Residence, Plaintiff paid the entire earnest money deposit of $9,000.00, because Debtor at the time did not have the funds to advance his agreed one-half of that sum. Plaintiff made that earnest money payment in reliance on the agreement with Debtor described above that Debtor would reimburse her one-half of that payment. (Pl.Affid., ¶ 6)

24. Before closing on purchase of the Residence, the Debtor informed Plaintiff that he would be unable to advance his one-half share of the remaining cash cost of purchasing the Residence, because he was unable to sell the Townhouse in order to acquire the necessary funds within the time required to close the Residence purchase. (Pl.Affid., ¶ 7)

25. Because of Debtor's lack of funds, Plaintiff paid all of the cash balance needed to close purchase of the Residence, in the amount of $42,000.00. Plaintiff made that $42,000.00 payment in reliance on the agreement with Debtor described above, that Debtor would reimburse her one-half of that payment. (Pl.Affid., ¶ 10)

26. Plaintiff and Debtor purchased the residence in September 1995. To consummate their purchase of the Residence, Plaintiff and Debtor jointly obligated themselves for a loan in the principal amount of $147,000.00, secured by a first mortgage on the Residence, to fund the purchase price balance. (Pl.Affid., ¶ 11)

27. In the Summer of 1996, Plaintiff requested Debtor/Defendant to reimburse

her for one-half of the sums paid by Plaintiff in connection with the purchase of the Residence, as described above. At that time, the Debtor explained that he still had not sold the Townhouse, and that he could not secure a personal loan because he then was obligated on first mortgage loans on both the Townhouse and Residence, and only could repay Plaintiff from the proceeds of a home equity loan which he and Plaintiff could secure using the Residence as collateral. The Debtor then made a verbal agreement with Plaintiff that if such a home equity loan were obtained, he would undertake to pay off that loan, and would use the proceeds from that loan to repay Plaintiff for her advances of his share of the cash cost involved in purchasing the Residence. (Pl.Affid., ¶ 12)

28. In reasonable and justifiable reliance upon her foregoing several agreements made with Debtor and his representations, Plaintiff then agreed verbally with Debtor to obtain such a home equity loan, and she and Debtor obtained a home equity line of credit in the amount of $20,000.00, secured by a second mortgage on the Residence, on or about July 31, 1996. (Pl.Affid., ¶ 14) Negotiations for and activities in connection with securing and closing that loan were conducted by the Debtor. The Plaintiff did not attend the closing of the loan, nor did she know at any time prior to the closing of the loan and disbursements that loan proceeds would be paid to any person other than herself. (Pl.Affid., ¶ 14)

29. Extension of the home equity line of credit was conditioned upon payment from loan proceeds thereof of substantial personal credit card debts of the Debtor. At no time prior to the closing of the home equity loan was the Plaintiff advised, or did she know, that the loan would not be funded except upon the condition that a substantial portion of the loan proceeds would be applied toward liquidation of certain credit card debt which the Debtor had incurred in his own name. At no time prior to closing of the home equity loan, or

until the home equity loan proceeds were funded, was Plaintiff ever advised that the available proceeds would be used to pay credit card debt earlier incurred by the Debtor in his own name. (Pl.Affid., ¶ 15)

30. Ultimately, as a consequence of the Plaintiff's agreement to enter into the home equity loan, the following occurred:

a) $14,239.46 of the proceeds of the second mortgage line of credit loan was applied at closing to the payment of the balances on certain of the Debtor's credit card obligations, as a condition to the funding of that loan. That payment of the Debtor's personal debt was made without Plaintiff's prior knowledge or consent.[3]

b) The balance of proceeds from the home equity loan was deposited into a joint account of these parties against which funds could be drawn on a line-of credit basis.

c) Against the balance of the home equity line of credit, the Debtor wrote additional checks to pay other of his personal credit card bills and to make a deposit into his personal checking account. These additional payments also were made without Plaintiff's prior knowledge or consent. After those payments, only $5,000 remained of the loan proceeds.

d) Although she was promised the entire proceeds of the $20,000 home equity loan, she received only $5,000.00 from proceeds of the second mortgage loan. (Pl. Affid., ¶ 16 and Group Exhibit B thereto)

31. After closing of the second mortgage home equity loan in July 1996 and until May 1997, Plaintiff received no further reimbursement of the sums due and owing to her from Debtor/defendant to fulfill his promise to share in cost of purchase of the Residence. (Pl.Affid., ¶ 17)

32. From the time of the closing of the purchase of the Residence until May 1997, Plaintiff performed all of the obligations to be performed by her under the agreement with Debtor to acquire the residence in joint ownership with an equal sharing of purchase cost and ownership interest, and to keep and maintain the Residence by equal contributions. In particular, during that time period she advanced from her personal funds not less than one-half of the sum of mortgage loan payments, and payments for such items agreed to be jointly by them for real estate taxes, insurance and maintenance. (Pl.Affid., ¶ 18)

33. By the Spring of 1997 the relationship between the Debtor and the Plaintiff deteriorated. They agreed to terminate their living relationship and sold the Residence on May 30, 1997 At the closing of that sale, the balance due on the home equity loan, in the amount of $20,206.17, was paid in full out of sale proceeds. By agreement of Plaintiff and Debtor, the entire remaining net proceeds of sale in the amount of $31,901.50 were paid to Plaintiff in order to reimburse her in part for sums paid by her in excess of those sums which she had agreed to pay for purchase of the Residence and retirement of the home equity loan. (Pl. Affid., ¶ 19 and Exhibit C thereto).

34. Since closing of the Residence sale, and despite demands made by Plaintiff to the Debtor, the Debtor failed and refused to pay Plaintiff those sums remaining due and owing to her by reason of her ad-

---

3. The Settlement Statement for this loan, the first of a series of documents annexed to Plaintiff's Affidavit as Group Exhibit B, discloses the disbursements out of the loan proceeds of $14,239.46 for credit card debts. This document also purports to bear Plaintiff's signature. She did not attend the closing on this loan; and her affidavit says that the signature on this Settlement Statement is not her signature. She corroborates that statement by offering for comparison Plaintiff's authentic signatures on the Settlement Statement and Closing Statement on the purchase of the Residence (Group Exhibit A to her Affidavit); her signature on the home equity loan promissory note (also part of Group Exhibit B to her Affidavit); and her purported signature on the Settlement Statement relating to the 1997 sale of the Residence (Exhibit C to her Affidavit).

vances of cash made in connection with the purchase of the Residence, and by reason of his personal use of proceeds of the home equity line of credit. (Pl.Affid., ¶ 20)

35. Under her above-described agreements with Debtor, and by reason of transactions described above, the Plaintiff remains due and owing the principal amount of $24,755.42, calculated as follows:

a. One-half of the cash sums of $51,-000.00 paid by Plaintiff to purchase the Residence, or $25,500.00; plus

b. The sum paid at the closing of the sale of the Residence to pay off the home equity loan, or $20,206.17; less a credit for

c. The sum of $5,000.00 paid to Plaintiff from the proceeds of the home equity loan; less a credit for

d. One-half of the net proceeds of sale of the Residence, or $15,950.75.

36. Additional fact statements contained in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

1. This action is a civil proceeding arising in, under and related to a case filed by the Defendant as Debtor under Title 11, Chapter 7 of the United States Bankruptcy Code.

2. This court has jurisdiction over the Complaint pursuant to 28 U.S.C. § 1334, and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

3. This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2)(J).

4. Venue is proper in this court pursuant to 28 U.S.C. § 1409.

#### Objections To Discharge—Count I 11 U.S.C. §§ 727(a)(4)(A), 727(a)(2)(B) and 727(a)(3)

5. Section 727(a)(4)(A) of the Bankruptcy Code provides that a debtor will be denied a discharge in bankruptcy if he "knowingly and fraudulently ... in or in connection with the case ... made a false oath or account...." In order to be denied a discharge under § 727(a)(4)(A), the Plaintiff must prove by a preponderance of the evidence that Debtor made under oath false statements, known to be false, with intent to deceive, and that those statements were material to the bankruptcy case. *In re Bailey*, 147 B.R. 157, 162 (Bankr.N.D.Ill.1992); *In re Matter of Rubel*, 1989 WL 105751, at 4 (Bankr.N.D.Ill.)

6. Any false statement made in a bankruptcy petition, schedule or statement of financial affairs constitutes a false oath within the meaning of Section 727(a)(4)(A). Sec. Fed.R.Bankr.P. 1008. Additionally, false testimony given during a 341 creditors meeting under 11 U.S.C. § 341 or during a deposition may also satisfy this element. *In re Yonkers*, 219 B.R. 227, 232 (Bankr.N.D.Ill.1997).

7. The preceding Findings Of Fact establish that the Debtor/Defendant here repeatedly provided false or misleading information in this bankruptcy under oath, which he knew to be false, concerning his property, income, and financial affairs.

8. A statement is deemed material for purposes of Section 727(a)(4)(A) if it relates to the debtor's estate, discovery of assets, disposition of property or a debtor's entitlement to discharge. *Yonkers*, 219 B.R. at 234; *In re Baker*, 205 B.R. 125, 133 (Bankr.N.D.Ill.1997).

9. The false statements contained in Debtor's Schedules and Statement of Financial Affairs were material to the Debtor's bankruptcy estate and to his entitlement to a discharge in bankruptcy. As the Findings reflect, there were numerous omissions and misstatements pertaining to the personal property of the Debtor, and as to nature and sources of his income.

10. The last element one must establish to prevail under Section 727(a)(4)(A) is that the debtor possessed the requisite intent to deceive or defraud when he omitted information from the bankruptcy

schedules or provided incorrect information.

■ 11. Direct evidence of fraudulent intent is not required; rather, it is sufficient to prove by circumstantial evidence either a pattern of concealment and errors or other conduct that suggests reckless indifference to the truth. *See, e.g., In re Hedberg,* 1998 Bankr.LEXIS 531 (S.D.Fla.1998)(looking at cumulative effect of various omissions and misstatements); *In re Schachter,* 214 B.R. 767, 773 (Bankr. E.D.Pa.1997) (pervasive and numerous errors, concerning income and assets) all to debtor's benefit, evidences fraudulent intent; *In re Johnson,* 139 B.R. 163, 170 (Bankr.E.D.Va.1992) (cumulative effect of eight material omissions was evidence of a "reckless indifference to the truth" serious enough to supply the necessary fraudulent intent); *Rubel,* 1989 WL 105751, at *4; *In re Braun,* 98 B.R. 382, 385 (Bankr.N.D.Ill. 1989).

■ 12. Fraudulent intent will not be found where the errors are inadvertent, negligent, or merely careless. *Baker,* 205 B.R. at 132. There is no evidence in this record that any of those excuses may be attributed to the Debtor's conduct and omissions. He made no effort even to defend against the claims made against him here by which his discharge was sought to be denied, nor did he offer any excuse for omissions of matters and information omitted from his Schedules and Statement of Financial Affairs when he was examined as to such matters during his Rule 2004 examination.

13. In this district and elsewhere discharges in bankruptcy have often been denied due to a debtor's failure to disclose or truthfully disclose all requested information on his bankruptcy schedules or statement of financial affairs. *See Yonkers,* 219 B.R. at 234 (denied discharge for failing to disclose existence of a part-time job, although debtor's earnings from the job were disclosed); *Baker,* 205 B.R. at 133 (denied discharge for failing to disclose

ownership of 100 fish tanks); *In re Gannon,* 173 B.R. 313, 319 (Bankr.S.D.N.Y. 1994) (denied discharge for failing to disclose all income earned over previous two years and failure to disclose a claim).

14. The Debtor amended his Schedules in this case after the initial Section 341 creditors' meeting, but only for the singular purpose of identifying and declaring as exempt a certain 401(k) retirement account. All other omissions of information required to be disclosed by him, as described in the foregoing Findings of Fact, could have been disclosed in those amended filings, but were not so disclosed. This conduct of Debtor/Defendant lends additional support to the conclusion that he acted with the requisite intent.

15. It is established on this record, by the Debtor's default of the Plaintiff's allegations and by the additional evidentiary submissions offered by the Plaintiff and admitted into evidence at the prove-up, that the Debtor's numerous omissions and false material statements in his bankruptcy Schedules and Statements of Financial Affairs, were made with the requisite fraudulent intent in violation of Section 727(a)(4)(A).

■ 16. In verifying his Petition under oath, and in affirming under oath at his creditors' meeting that the information contained in his Petition was true and correct, the Debtor made false oaths in that:

a. He failed to disclose in Schedule B to his Petition his ownership interests in the several auto vehicles described above;

b. He failed to identify at item 2 of his Statement Of Financial Affairs receipts from sale of the automobiles, and income from real property rental and from gambling, as described above; and

c. He failed to disclose on his Statement Of Financial Affairs the transfer of ownership of automobiles within one year of the commencement of this Chapter 7 case, as described above.

17. In making such false oaths, the Debtor did so knowingly and fraudulently, and in connection with this Chapter 7 case, within the meaning of Section 727(a)(4)(A) of the Bankruptcy Code.

18. In transferring his interest in one or more automobiles after the commencement of this Chapter 7 case, the Debtor transferred property of the estate, after the date of the filing of his Petition, with the intent to hinder, delay or defraud his creditors and the trustee in this case. Such is conduct for which the Debtor may and should be denied a discharge in bankruptcy, pursuant to § 727(a)(2)(B) of the Bankruptcy Code.

19. The Debtor's aforesaid conduct is also conduct for which the Debtor may and should be denied a discharge in bankruptcy, pursuant to § 727(a)(3) of the Bankruptcy Code for his failure to keep records from which his financial transactions might be ascertained.

20. Section 723(a)(3) of the bankruptcy Code is designed to insure that the bankruptcy trustee and creditors will have sufficient information to permit an effective evaluation of the debtor's estate, and is a condition precedent to the granting of a discharge in bankruptcy. If such a disclosure is not possible without the keeping of books and records, then the absence of such documents constitutes failure of record keeping to which the Bankruptcy Code applies. *In re Moreau*, 161 B.R. 742, 746 (Bankr.D.Conn.1993).

21. In order to support a denial of discharge under Section 727(a)(3), it is not necessary to establish that a debtor acted with intent to conceal his financial condition. *Id. In re Brown*, 56 B.R. 63, 66 (Bankr.D.N.H.1995)

22. Whether a debtor's books and records are adequate, for the purposes of an objection to discharge, is determined generally by whether such books and records are adequate to permit the court and creditors to trace the debtor's financial

dealings. *In re Potter*, 88 B.R. 843, 848 (Bankr.N.D.Ill.1988).

23. The Debtor's failure to retain records of his financial transactions, as described in the foregoing Findings of Fact, was not in compliance with his obligations under Section 723(a)(3). In addition to the Debtor's failures in record keeping, he also provided little or no testimony which might have provided his creditors with information which would have been the equivalent of that information which his records and papers would have revealed, had they existed. Instead, he repeatedly resorted to an absence of recollection when being questioned by Plaintiff's attorney at the Rule 2004 examination regarding his financial affairs and transactions relevant to these proceedings.

24. In retaining only those nominal documents identified hereinabove, Debtor made it impossible for his creditors to determine the use of the Debtor's cash assets through his bank accounts and credit card transactions, the nature of and proceeds from his disposition of assets such as automobiles sold in 1998, the veracity of the Debtor's assertions as to the value and identity of his personal property, and other matters which would have been of relevance and interest to the Debtor's trustee and his creditors.

25. By his conduct and omission with respect to his financial records, the Debtor concealed, destroyed, or failed to keep or preserve, recorded information, including books, documents, records and papers, from which the Debtor's financial condition or business transactions might be ascertained, without justification under the circumstances.

26. Defendant did not show justification for his failure to maintain and retain ordinary records, and he may and should therefore be denied a discharge in bankruptcy pursuant to § 727(a)(3) of the Bankruptcy Code.

## Dischargeability Of Debt—Count II 11 U.S.C. § 523(a)(2)(A)

27. Under Section 523(a)(2)(A) of the Bankruptcy Code, the use of "false pretenses, a false representation or actual fraud" in order to secure credit, money or property from another is ground for denial of dischargeability of a debt.

28. Within the meaning of this Section of the Bankruptcy Code, "actual fraud" may include "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done, or omitted with the design of perpetrating what is known to be a cheat or deception." *In re Grocki,* 147 B.R. 274, 277 (Bankr.S.D.Fla.1992). In order to establish such fraudulent intent, circumstantial evidence may be relied on. *Id.*

29. "[W]hen a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held nondischargeable.... In other words, proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent." *In re Sheridan,* 57 F.3d 627, 635 (7th Cir.1995). Moreover, fraud under Section 523(a)(2)(A) may lie for a knowing and deliberate misstatement of future intention. *In re Alicea,* 230 B.R. 492, 501 (Bankr.S.D.N.Y.1999).

30. Although the issue was not briefed, the court has considered whether the oral agreement between Plaintiff and Debtor falls within the purview of the statute of frauds and is therefore unenforceable. The relevant Illinois statute governing contracts involving land provides:

No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith....

740 ILCS 80/2.

However, Plaintiff is not attempting to enforce an oral contract to purchase or sell real property, nor is she attempting to gain or give an interest in real property. Plaintiff's and Debtor's oral agreement did not itself serve or purport to sell or buy land or to gain or yield any interest in land to Debtor. Rather, Plaintiff is simply attempting to enforce an oral side agreement that she and Debtor entered into providing for their equal contribution of cash toward purchase of the Residence.

31. The Debtor engaged in a course of acts, misstatements and material omissions of fact which constituted fraudulent conduct violative of Section 523(a)(2)(A) of the Bankruptcy Code, in that:

a. He promised Plaintiff that he would contribute one-half of the initial expense of purchasing the Residence from the proceeds of the sale of the Townhouse, knowing that such proceeds—even were the Townhouse to be sold—would be insufficient to live up to that promise; and

b. He later induced Plaintiff to borrow and place under his control proceeds of the home equity loan when he caused her to believe reasonably and justifiably that such proceeds would be used to repay a portion of the monies he owed her when he actually then knew that as a condition of that loan most of those funds would be used instead to pay his credit card debit.

32. By reason of such conduct, Plaintiff is entitled to judgment that her claim against the Debtor for the debt he owes her is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

33. Plaintiff has prayed for in her Complaint, and the Court has the authority to enter in her favor, a money judgment on that claim. *See, In re Halla-*

*han,* 936 F.2d 1496, 1508 (7th Cir.1991); and *In re Glatstian,* 215 B.R. 495 (Bankr. D.N.J.1997).

34. By her defaulted Complaint taken as confessed against Defendant and additional evidentiary submission, Plaintiff has established that she is entitled to a money judgment against the Debtor in the principal amount of $24,755.42.

35. Plaintiff also is entitled to prejudgment interest on her claim, by reason of the fact that she has been wrongfully deprived of money, and in order to compensate. Said interest award shall be calculated by reference to federal law under 28 U.S.C. § 1961, which has been found to authorize allowance of pre-judgment as well as post-judgment interest. *Pierce v. Pyritz,* 200 B.R. 203, 206 (N.D.Ill.1996), citing *In re Oil Spill,* 954 F.2d 1279, 1330–31 (7th Cir.1992). Said interest awardable accrues from the times when monies were advanced by her or on her behalf in connection with the purchase and refinancing of the Residence, to the date of entry of judgment in her favor. *Glatstian,* 215 B.R. at 498. Plaintiff's Memorandum filed February 3, 2000, properly calculated prejudgment interest to total $6,104.06 through January 31, 2000, plus per diem interest of $4.76 thereafter to the day of judgment, today totaling $6,270.66 in prejudgment interest.

36. Plaintiff is further entitled to an award of her taxable costs incurred herein.