In re Joseph A. BRENES, Debtor.

Casa Investments Company, Plaintiff,

v.

Joseph A. Brenes, Defendant.

General Financial Services,
Inc., Plaintiff,

v.

Joseph A. Brenes, Defendant.

Bankruptcy No. 95–30185 (ASD).
Adversary No. 95–3048.

United States Bankruptcy Court,
D. Connecticut.

April 17, 2001.

Jeffrey McChristian, Gussak, Silver, Sklar, Jacobson & Kirsch, Hartford, CT, for the Debtor.

Marc S. Edrich, Pepe & Hazard, Hartford, CT, Paul Gaide, Gaide and Gilmore, L.L.C., Avon, CT, for CASA Investments.

Doris B. D'Ambrosio, Wetstone and D'Ambrosio, Farmington, CT, for General Financial Services, Inc.

## MEMORANDUM OF DECISION ON CONSOLIDATED COMPLAINTS OBJECTING TO DISCHARGE

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

The above-referenced and consolidated adversary proceedings, initiated by the fil-

ing of complaints objecting to the Debtor's discharge, the Plaintiffs, Casa Investments Company and General Financial Services, Inc., assert four statutory predicates for denial of discharge: Bankruptcy Code Sections 727(a)(2) (transfer of property with intent to hinder, delay or defraud creditors), 727(a)(3) (failure to keep or preserve books and records), 727(a)(4) (false oaths and accounts), and 727(a)(5) (failure to account for loss of assets). The factual allegations in these adversary proceedings sketch a picture of an abusive and dishonest debtor. Indeed, certain evidence presented by the Plaintiffs during extended evidentiary hearings held in these proceedings raises the specter of a disturbing debtor agenda attended by possible under-reporting and concealment of substantial material assets, as well as false statements and testimony.

This initial impression, however, does not weather the evidence as a whole, and particularly the notably credible trial testimony of Dr. Joseph A. Brenes (hereafter, "Dr. Brenes" or the "Debtor"), which the Court views as highly persuasive of the fact that in prosecuting his bankruptcy case, or in contemplation thereof, or preliminary thereto, the Debtor did not act with fraudulent intent, or otherwise engage in conduct warranting discharge denial pursuant to Bankruptcy Code Sections 727(a)(2), (3), (4) or (5). The Court, having now considered all the evidence, having received and reviewed the parties' respective briefs, and in view of, *inter alia,* the aforementioned credible trial testimony of the Debtor, determines Dr. Brenes is entitled to his discharge as more fully explained hereafter

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(J).

## III. FACTUAL BACKGROUND

Dr. Brenes, a physician employed in the practice of internal medicine since 1980, was raised and educated through college in Puerto Rico. He obtained his undergraduate Bachelor of Science degree with a major in chemistry and minors in military science and theology at the Inter–American University of Puerto Rico in 1969. Upon graduation from Inter–American University, he joined the United States Army, saw combat service in Vietnam, and received the Bronze Star and other decorations. Following an honorable discharge from the United States Army, Dr. Brenes attended medical school in the Dominican Republic, receiving his medical degree in 1977. While Dr. Brenes has twenty-three (23) years of formal education, he had no business, accounting or tax courses in college or medical school. He has been married twice, with two (2) children from his prior marriage, and five (5) children from his present marriage to Linda A. Brenes. His native and primary language is Spanish, speaking it more than 50% of the time in connection with his medical practice, where he has a largely indigent patient population. Dr. Brenes is also fluent in the English language and is a past President of the Waterbury Medical Association.

Dr. Brenes interned at the Yale School of Medicine, and following several years of residency at Yale–New Haven Hospital, Saint Mary's Hospital, and Waterbury Hospital, commenced the private practice of medicine at 447 Wolcott Road, Wolcott,

Connecticut. During his residency period, Dr. Brenes volunteered numerous night hours at Saint Mary's Hospital to serve impoverished patients who eventually became the foundation for his private practice of medicine.

From 1980 to 1986, the Debtor engaged in a solo medical practice. In 1986, Dr. Camille Raad joined him, and the practice changed its name to Associates in Internal Medicine, Inc. (hereafter, "AIM"). In the Spring of 1986, the Debtor and Dr. Raad purchased and improved real property at 464 Wolcott Road (hereafter, the "Offices"), and moved the practice to this location from 447 Wolcott Road. In connection with this move, Dr. Brenes and Dr. Raad created BAR Associates, a partnership for the ownership and management of the new Offices. The Debtor invested substantial sums of his own money in the Offices including money from his children's savings. In addition, two mortgages totaling approximately $2.2 million were taken against the Offices.

In 1988, Dr. Brenes created and implemented a concept he named "Community Medical Specialists"[1] (hereafter, "CMS"), to bring medical specialists into the Offices to provide "one-stop-shop" medical services to the patient community. This concept, from which no fees for medical services were generated to AIM or the Debtor, operated from approximately 1988 to sometime in the early 1990's.

The Debtor had interests in a number of other entities which embodied the owning or managing of real estate, or involved the provision of medical or medically related services. These entities included:

a. Wolcott Physical Therapy (hereafter, "WPT")—and commonly known as WPT, a physical therapy business managed from approximately late 1989 to October, 1995, whose operations were reported on the BAR Associates partnership tax returns.

b. BSV Associates—a real estate partnership in which the Debtor held a one-third interest since approximately 1987.

c. Associates in Internal Medicine 2000, P.C. (hereafter, "AIM 2000")—and commonly known as AIM 2000, in operation since August 24, 1994.

d. Kinetics, Inc.,[2] in which the Debtor had a one-sixth interest.

The Debtor and these entities took on additional debt in the late 1980s. By February of 1990, four more physicians were hired in association with a joint venture with St. Mary's Hospital to develop a satellite office in Cheshire, Connecticut. At the same time, BAR Associates took on additional debt, guaranteed by the Debtor, totaling approximately $600,000, to finance improvements for various tenants in the Offices.

Within eighteen months, the joint venture with St. Mary's Hospital failed, the Cheshire office was closed, and three physicians staffing that office were brought to the Offices. By September of 1991, AIM was having difficulty paying it's payroll taxes, it's rent to BAR Associates, and BAR Associates was delinquent on mortgage payments. Correspondingly, the Debtor began experiencing personal finan-

---

1. Community Medical Specialists, Inc.—commonly known as CMS, operated from 1992 to approximately February, 1995. Its operations were reported on consolidated tax returns with AIM. A medical lab entitled CMS Labs was operated under the auspices of AIM, and was closed in 1994.

2. Other than the 1993, 1994 and 1995 IRS Form K–1's entered as Exhibits 19, 24 and 29, respectively, all of which show losses, there was little evidence concerning the Debtor's interest in this entity.

cial difficulties, and, in late 1992, the Debtor defaulted on payments on a loan to First Federal Savings and Loan, was unable to pay his 1992 personal income taxes, and sold his Lincoln Town Car in order to cut his monthly expenses.

Attempts at restructuring the debt of his medical practice, commencing in 1992 and continuing into 1993, failed, with four out of the six physicians at AIM leaving that practice during that period. This plunge in the number of doctors seriously depressed referrals to Wolcott Physical Therapy, Community Medical Specialists, Inc., and CMS Labs. At the same time, the abolishment of "no fault" insurance, the advent of HMO's, and the institution of cost-containment measures in the health care industry resulted in falling revenues to the Debtor's practice. In addition, numerous lawsuits were commenced by various creditors of AIM, BAR Associates and the Debtor.

In August of 1994, the IRS levied on AIM's Medicare receivables for delinquent payroll taxes. AIM 2000 was incorporated on August 24, 1994, assuming the assets and tax attributes of AIM, in order to permit payment to the IRS over time, and the continued operation of the medical practice.

In January of 1995, First Federal Savings and Loan, after having replevied the Debtor's Porsche, and obtained a deficiency judgement, levied on the Debtor's joint checking account with his wife. The Debtor testified that his frame of mind at this time was "very distraught," that his wife and children were under much stress,[3] and that he was nervous, anxious and embarrassed by the prospect of filing bankruptcy.

In connection with the aforementioned attempts to restructure the debt of his medical practice, Dr. Brenes completed, and submitted to Centerbank, in January and June, 1992, Financial Statements (hereafter, collectively, the "Financial Statements"). A facial comparison of these Financial Statements to the Debtor's bankruptcy schedules reflects, *inter alia*, the following disparities:

| | January Statement | June Statement | Bankruptcy Schedules |
|---|---|---|---|
| Assets | $6,256,000.00 | 5,982,000.00 | 789,250.00 |
| Liabilities | 2,229,000.00 | 4,369,000.00 | 4,353,375.00 |
| Net Worth | 4,027,000.00 | 1,613,000.00 | (3,564,125.00) |
| Household Furnishings | 150,000.00 | N/A | –0–, amended to 8,000.00 |
| Art, jewelry, collectibles | 250,000.00 | N/A | $1,000.00(misc. Jewelry) |
| Market Value 447 Wolcott | 4,200,000.00 | 4,200,000.00 | $1,000,000.00 |
| Market Value Aruba Property | 250,000.00 [4] | 150,000.00 [5] | 30,000.00 [6] |

3. At about this time, and in view of their desperate financial situation, Mrs. Brenes, without consulting her husband, liquidated significant pieces of jewelry given to her by her husband in the 1980s by selling all of them but for a watch and necklace in New York City for $11,300.00. Dr. Brenes testified that upon learning of this sale, he felt "bad" and, consequently, sold a ring, apparently his wedding ring, for $1500.00.

4. Listed as and representing a "50%" ownership interest.

5. Listed as and representing a "½" ownership interest.

6. Scheduled as and representing a "1/4" ownership interest.

| | | | |
|---|---|---|---|
| Market Value<br>Atlantic City<br>Property | 225,000.00 [7] | 200,000.00 [8] | –0–, amended to $100,000.00 |

The Financial Statements also attributed significant valuations to various business interests all of which were scheduled in the bankruptcy case with a value of zero. These and additional inconsistencies between the Financial Statements and the Debtor's Bankruptcy Schedules constituted a significant factual basis for the Plaintiff's objections to discharge.

## IV. DISCUSSION

■ Appreciative that denial of a debtor's discharge "imposes an extreme penalty for wrongdoing," the United States Court of Appeals for the Second Circuit in *In re Chalasani*, 92 F.3d 1300, 1310 (2d Cir.1996), has instructed that Section 727 "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt'" *Id.* Nevertheless, the relief of a bankruptcy discharge is not an absolute right, but rather, a privilege accorded honest debtors who provide full and honest disclosure to creditors and otherwise satisfy bankruptcy statutory obligations.

■ The party objecting to the granting of a discharge bears the ultimate burden of persuasion by a preponderance of the evidence in an adversary proceeding pursuant to Section 727(a). Fed.R.Bank.P. 4005. *Cf. Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### A. COUNT ONE—Section 727(a)(3)— Insufficient Books and Records

The Plaintiffs' First Claim for Relief, pursuant to 11 U.S.C. § 727(a)(3), is based upon a claim that Dr. Brenes, without justification, concealed, destroyed, mutilated, falsified, and failed to keep or preserve any recorded information from which his financial condition and business transactions might be ascertained.

Bankruptcy Code Section 727(a)(3) provides in full as follows:

> (a) The court shall grant the debtor a discharge, unless—

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

■ The purpose of the Bankruptcy Court provisions barring discharge for failure to keep adequate records is to insure that trustees and creditors have enough information on hand to effectively trace, evaluate, and reconstruct the financial history and present condition of the debtor's bankruptcy estate. *E.g. In re Blonder*, 258 B.R. 534 (Bankr.D.Conn.2001); *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 837 (Bankr.E.D.N.Y.2000); *In re Frommann*, 153 B.R. 113, 116 (Bankr. E.D.N.Y.1993); *Aid Auto Stores, Inc. v. Anthony Pimpinella (In re Pimpinella)*,

---

**7.** Mortgaged at $155,000.00; listed as and representing a "50%" ownership interest.

**8.** Mortgage at $220,000.00; listed as and representing a "1/2" ownership interest.

133 B.R. 694, 697 (Bankr.E.D.N.Y.1991); *See also In re Underhill,* 82 F.2d 258, 260 (2d Cir.1936), *cert. denied,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936) (applying corresponding provision of the Bankruptcy Act); *In re Harron,* 31 B.R. 466, 469 (Bankr.D.Conn.1983). The Plaintiff must show that "the debtor either failed to keep or preserve records ... [and] such failure ... makes it unduly burdensome to determine the debtor's financial condition and material business transactions." *In re Wolfson,* 139 B.R. 279, 286 (Bankr. S.D.N.Y.1992). The records need not be in any particular form; however they must be sufficient to "enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Office of the Comptroller General v. Tractman,* 107 B.R. 24, 26 (S.D.N.Y. 1989).

■ Once a plaintiff has established a prima facie case that the debtor concealed, destroyed, or failed to keep material records, the burden of proof shifts to the defendant to furnish credible, rebuttal evidence that such act or failure was justified. *E.g., In re Blonder, supra,* 258 B.R. 534; *In re Hecht,* 237 B.R. 7, 9 (Bankr.D.Conn. 1999); *In re Moreau,* 161 B.R. 742, 746 (Bankr.D.Conn.1993); *United States Fidelity and Guaranty v. Delancey (In re Delancey),* 58 B.R. 762, 767 (Bankr. S.D.N.Y.1986).

■ Section § 727(a)(3) does not specify what constitutes justification for maintaining inadequate records, but rather it requires the court to make a determination based upon all the circumstances of the case. *In re Halpern,* 387 F.2d 312, 314 (2nd Cir.1968) ("What constitutes adequate record keeping, 'is a question in each instance of the reasonableness in the particular circumstances' "), *quoting In re Underhill, supra,* 82 F.2d at 259–60; *Meridian Bank v. Alten,* 958 F.2d 1226 (3d Cir.1992). In considering a debtor's justification for missing records, the court may consider

1. Whether the debtor is engaged in business, and if so, the complexity and volume of the business;

2. The amount of the debtor's obligations;

3. Whether the debtor's failure to keep or preserve records was due to the debtor's fault;

4. The debtor's education, business experience and sophistication;

5. The customary business practices for record keeping in the debtor's type of business;

6. The degree of accuracy disclosed by the debtor's existing books and records;

7. The extent of any egregious conduct on the debtor's part; and

8. The debtor's courtroom demeanor,

*E.g., In re Sethi, supra,* 250 B.R. at 838, as well as "any special circumstances that may exist." *Id.* at 839. Intent, however, is not a requisite element to be specifically proved for a denial of discharge under Section 727(a)(3). *Matter of Esposito,* 44 B.R. 817, 827 (Bankr.S.D.N.Y.1984).

■ During the trial the Plaintiffs established, and the Debtor acknowledged, that he failed to "make"[9] certain records

---

9. The Debtor seems to argue that "keep" as used in Section 727(a)(3) is limited in definition to a failure to preserve that which exists. ("There was no failure to keep ... records [regarding jewelry, BSV Associates and Atlantic City] [because] A. no such records existed to keep..., B. no such records were ever provided to the Debtor, other than what he did keep....,") *Defendant's Proposed Findings of Fact,* Doc. I.D. No. 86, page 10, ¶ 12. This

related to his business and personal affairs. For example, although Dr. Brenes was an Officer, Shareholder and Director of AIM, and was present at its meetings, no minutes were taken of corporate decisions. In 1994 and 1995, loans were made to the Debtor from some of his business entities, yet no formal records were generated. The lack of certain records is compounded by the Debtor's apparent commingling of personal affairs with those of some of the business entities in which he held an interest. For example, the Debtor's office manager, Israel Rivera, testified that personal expenses of the Debtor were often paid from the AIM or AIM 2000 office accounts.

In addition, the Debtor did not have complete records regarding certain real property, *i.e.*, the Aruba Property and the Atlantic City Property, which were listed by the Debtor on the Financial Statements submitted to Centerbank in connection with attempts to obtain loans or refinancing approximately two years prior to his filing for bankruptcy. Furthermore, the Debtor listed jewelry on his bankruptcy schedules with a value of $1,000.00, whereas on the January, 1992 Financial Statement the Debtor listed "art, jewelry and collectibles" in the amount of $250,000.00. The Debtor explained this discrepancy, in part, by the sale of substantially all of his and his wife's jewelry without obtaining or making documentation corroborative of such sales.

Having determined that the Debtor failed to "keep" certain material records, the Court must now turn to examine whether such failure made it unduly burdensome to determine the Debtor's financial condition and material business transactions, and, if so, whether such failure was justified. The burden on the former is the Plaintiffs'—the burden on the later is the Debtor's.

Although failing to make certain records, Dr. Brenes did keep and disclose tax returns, corporate documents, deeds and mortgages on real estate, accounts receivable records, and other documents relating to his business and personal financial situations. These records included:

a. Corporate documents and stock certificates of AIM 2000, P.C.

b. Federal tax returns and other tax documents of the Debtor and his businesses for tax years 1992 or 1993 forward.[10]

c. Accounts receivable printouts of various businesses.

d. Projected and historical statements of continued operations of AIM PC, BAR Associates, CMS and WPT.

e. Deeds, appraisals and other records regarding or relating to the Debtor's business and personal circumstances.

f. Ledgers of AIM, CMS and BAR Associates.[11]

In addition, Dr. Brenes testified there were "more . . . [and] voluminous records" available at his office, which the Plaintiffs' declined to examine despite several opportunities. Plaintiffs' counsel explained this declination, stating the "Debtor's invitation to review records of his business entities is

---

Court, as has every authority cited by the parties on this issue, ascribes a broad meaning to the word "keep" to include to "make."

**10.** It is, of course, impossible to determine whether the Debtor's tax returns were totally accurate due to the absence of complete supporting documents.

**11.** Although Dr. Brenes testified that he had no records regarding the day-to-day business activities of BSV, he did produce IRS Form K–1s for tax years 1993, 1994 and 1995.

not an excuse or defense to debtor's failure to keep and preserve records and produce them in an organized fashion" and citing *Matter of Esposito,* 44 B.R. 817, 827 (Bankr.S.D.N.Y.1984) ("it is not the intent of the Bankruptcy Code to inflict upon the Trustee the burden of sifting through every shred of the remaining records, no matter how great the cost, in the hope of piercing together a debtor's financial condition").

In *Esposito,* the debtor was denied his discharge upon findings, *inter alia,* that he caused the *destruction* of most of the books and records of his company with obvious intent to conceal a fraud just several months before fleeing the country. Esposito's company was a substantial enterprise in the stream of commerce with liabilities in excess of $10 million and assets of at least $3.5 million. As the *Esposito* Court observed:

> Significantly, all of the following books and records, which are generally maintained by corporations of [the company's] type and size, are missing: general ledger, general journal, cash receipts journal, cash disbursements journal, accounts receivable ledger, accounts payable ledger, bank statements and canceled checks, inventory and material cost records, invoices, purchase journals, sales invoices, sales journals, payroll records, stock certificate and minute books, fixed asset records, federal and state corporate tax returns and other business and payroll tax returns.

*Id.* at 827. In *Esposito,* the only financial materials remaining in existence were few and "of no value in reconstructing the financial affairs of Esposito or [the company]." *Id.* The Court in *Esposito* reasonably concluded that "to allow Esposito to receive his discharge because of the mere fortuity that he ... failed to destroy every scrape of information ..., or that the trustee might possibly piece together some elements of [the company's] financial condition would stretch the discharge provisions of the Code to an absurd dimension." *Id.* at 827–828.

While Dr. Brenes was engaged in a complex medical practice and associated businesses, owned several parcels of real property, and the total amount of the obligations he seeks to discharge is significant, he is no Esposito. Esposito fled this country and was ultimately convicted of federal felony offenses. Dr. Brenes fought for this country and serves indigent medical patients. Esposito intentionally obliterated all relevant records. The Debtor, as set forth above, made, maintained and produced numerous records including corporate-federal tax returns, other tax documents, accounts receivable printouts, projected and historical statements, deeds, appraisals ledgers, and other records, and made, maintained, and offered for examination, additional, voluminous documents.

The Court has carefully examined the documents and records produced at trial and finds only a partial, not a complete or substantially complete, picture of the Debtor's financial affairs—the records produced at trial are insufficient to permit any party to reasonably and effectively trace, evaluate, and reconstruct a substantially complete financial history, and ascertain the present condition, of the Debtor's bankruptcy estate. And while it is conceivable that the additional records offered by the Debtor for inspection—but not examined by the Plaintiffs—would substantially complete the requisite picture, such a determination cannot be made on the trial record. Hence, the Court assumes, *arguendo,* that the Plaintiffs have met their burden of demonstrating that the Debtor failed to keep records from which his financial condition could be ascertained with

substantial completeness. Accordingly, the Court must now visit the question of whether Dr. Brenes was justified in failing to keep such records under all these circumstances.

██ The Debtor acknowledged little personal effort or desire to learn [12] or engage the business aspects of his medical practice. Under most circumstances, intentional neglect, or total indifference, to the responsibility to keep complete and detailed records, compute against a debtor in the Section 727(a)(3) calculus. But here, Dr. Brenes' educational, business and personal conduct was driven by an extraordinary focus on indigent patient care, his goal in becoming a physician. And as acknowledged by the Plaintiffs, a physician's primary focus on the medical care and treatment of indigent patients is to be applauded. Nevertheless, while commending Dr. Brenes' professional goals and focus, the Court recognizes that record keeping deficiencies cannot be justified *solely* on that basis.

Dr. Brenes, however, was not simply a patient-oriented physician who completely neglected or acted with total indifference to proper business record practices and kept no records. He delegated and reasonably relied upon and expected others—business managers, accountants and attorneys—to manage the business and financial affairs of his medical practice and related business enterprises. The records these other individuals kept provide a significant, *albeit* partial, picture of the Debtor's financial affairs.

With regard to the sale of personal items—i.e., jewelry—such sales did not transpire under circumstances where the failure to originate and maintain sales records is so unreasonable as to warrant a denial of discharge. There was no credible evidence of egregious conduct. Indeed the Debtor offered cooperation in further document production which was refused. Finally, the Debtor's courtroom demeanor was indicative of a compassionate, credible individual. The acknowledged failure to make certain records, as alleged, in view of all the circumstances of this case, was justified and is not fatal to the Debtor's bankruptcy discharge.

In summary, as to the First Count of the Complaint, while the Debtor failed to keep records from which his financial condition could be ascertained with substantial completeness, there was a quantum of accurate documentation made, preserved and produced, reflective of his general financial condition. There was no credible evidence that the Debtor intentionally concealed, destroyed, mutilated, or falsified any recorded information. Moreover, to the extent the Debtor's record keeping and *making* was deficient, he established ample justification for such failure, and produced sufficient credible evidence at trial, to warrant discharge notwithstanding the objection under 11 U.S.C. § 727(a)(3).

## B. COUNT TWO—Section 727(a)(4)— False Oaths and Accounts

The Second Count of the Complaint, based upon 11 U.S.C. § 727(a)(4), alleges Dr. Brenes knowingly and fraudulently made a false oath in or in connection with this bankruptcy case. The Second Count alleges various omissions from Dr. Brenes' bankruptcy schedules, and a failure to admit to the ownership, or to the correct ownership, of certain real estate and business entities in his Rule 2004 examination or Section 341 testimony.

---

12. As previously noted, Dr. Brenes took no business, accounting or tax courses in college or medical school.

Section 727(a)(4) provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

11 U.S.C. § 727(a)(4)(A)(1995).

 In order to deny discharge under Section 727(a)(4)(A), the plaintiff must establish that:

(1) the debtor made the statement under oath,

(2) such statement was false,

*(3) the debtor knew the statement was false,*

*(4) the debtor made the statement with fraudulent intent, and*

(5) the statement related materially to the bankruptcy case.

*E.g., In re Aiello,* 173 B.R. 254, 257 (Bankr.D.Conn.1994) (*quoting In re Wolfson,* 139 B.R. 279, 287–88 (Bankr.S.D.N.Y. 1992)) (emphasis added). *See also In re Maletta,* 159 B.R. 108, 112 (Bankr.D.Conn. 1993). Statements made in a petition and schedules are covered by § 727(a)(4), and statements made during Bankruptcy Rule 2004 examinations, or in connection with Section 341 testimony, are also covered. *In re Maletta, supra,* 159 B.R. at 112; *In re Kilson,* 83 B.R. 198, 202 (Bankr.D.Conn. 1988).

 Once the objecting creditor meets its burden of proof and has produced persuasive evidence of a false statement, the burden of production shifts to the debtor to come forward with some credible explanation for a false statement on the schedules. *E.g., In re Maletta, supra,* 159 B.R. at 112; *In re Arcuri,* 116 B.R. 873, 884 (Bankr.S.D.N.Y.1990).

 A statement is not deemed to be made with fraudulent intent simply because it is false, *In re Arcuri, supra,* 116 B.R. at 882, and a "statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth." *In re Maletta, supra,* 159 B.R. at 112. Knowingly and fraudulently mean "an intentional untruth in a matter material to the issue which is itself material." *Kilson, supra,* 83 B.R. at 202 *quoting In re Robinson,* 506 F.2d 1184, 1187 (2d Cir. 1974). A statement is considered material if it is pertinent to the discovery of assets. *In re Maletta, supra,* 159 B.R. at 112. The Court may consider the debtor's education, business experience and reliance on counsel when evaluating the debtor's knowledge of a false statement. *Id.*

 Regarding the relevant valuations of the Debtor's real property interests, the Plaintiffs offered no independent valuation testimony. The Bankruptcy Code and Rules does not require a debtor to have independent appraisals performed on each property to determine its value. Furthermore, in Connecticut, an owner of property is considered competent to testify regarding its value. *See Anderson v. Zweigbaum,* 150 Conn. 478, 483, 191 A.2d 133 (1963); *Lovejoy v. Darien,* 131 Conn. 533, 536, 41 A.2d 98 (1945); Colin C. Tait, et al., *Tait and LaPlante's Handbook of Connecticut Evidence* § 7.15.3(h) (2nd ed.1988).

*Atlantic City Property*

Regarding the alleged intentional failure to schedule his interest in real property located in Atlantic City, New Jersey, neither the Debtor, nor his wife, were aware that their names had been actually placed on the deed to the property. The Debtor's bankruptcy counsel testified that inquiry

was made into the Debtor's ownership of the property at the time the petition was to be filed, and the Debtor was not aware of his ownership interest at that time. The Debtor testified that he never had a copy of the deed or the records regarding the property in Atlantic City, and neither the Debtor nor his wife were cognizant that their names had actually been added to the deed to said property by the Debtor's father-in-law.

Notwithstanding the Debtor's inclusion of the Atlantic City Property in the Financial Statements, and the Debtor's father-in-laws inconsistent testimony, the Court credits the Debtor's testimony that he was not aware that his name, and that of Mrs. Brenes, had actually been added to the Atlantic City deed by his father-in-law. The Debtor's father-in-law testified that as part of a family discussion wherein he indicated financial difficulty in carrying the Atlantic City property, Dr. Brenes offered to help him out with expenses. He further testified that, thereafter, without prior knowledge or discussion with Dr. Brenes or his daughter, he added their names to the deed, and subsequently handed a copy of the deed to the Debtor or his daughter. The lack of any specific recollection on behalf of the Debtor's father-in-law concerning the circumstances of his providing a copy of the deed to the Debtor or his daughter, and the corroborative testimony of Mrs. Brenes that she was unaware of the deed until after her father's deposition in this proceeding, support this finding.[13]

Upon realizing he had an actual interest in the Atlantic City Property, the Debtor amended his schedules to reflect it. There was no benefit to the Debtor or harm to the creditors from his initial scheduling omission, as the mortgage balance on the Atlantic City property exceeds the value of said property.

*The Aruba Property*

The Debtor's interest in the Aruba property was accurately stated in the bankruptcy case as "25%." Testimony by three witnesses supported the belief of all of the parties to the purchase transaction, that each was to receive a one-quarter interest. A review of the deed to the property, written in Dutch, showed the names of four individuals as owners. The representations of "50%" and "½" interests in the Aruba Property on the January and June 1992 Financial Statements, respectively, even if intentionally false [14], do not form a basis for Section 727(a)(4)(A) relief. In addition, as discussed in more detail in Section C, *infra*, the bankruptcy case scheduling of the Debtor's interest in the Aruba Property at $30,000.00, was not established to be a false statement, knowingly made with fraudulent intent, by reference to the Financial Statements or otherwise.

*The Coe Road Property*

The property located at 40 Coe Road, Wolcott, Connecticut, was originally disclosed in connection with the bankruptcy petition as owned jointly by Dr. Brenes and his wife. An innocent mistake, coupled with counsel's error, was the cause of this acknowledged inaccuracy. The petition was amended to reflect the 100% ownership of the property by Dr. Brenes. This mistake was the product of the Debtor's belief that he owned the Coe Road property with his wife.[15] Like the Atlantic

---

13. Even after seeing the deed in Court, Mrs. Brenes testified "I still don't think I'm an owner in Atlantic City."

14. Dr. Brenes noted that the Financial Statements were intended to reflect his and his

wife's collective interest—each with a 25% interest in the Aruba Property.

15. A reasonable belief, given that (i) the monthly mortgage statement is in both their names, (ii) the Debtor's prior listing of the

City property, the failure to correctly state Dr. Brenes' interest on the original schedules was unfortunate, but not attended by the requisite fraudulent intent to conceal assets.

*Personal Property*

In relation to the alleged false statements made by Dr. Brenes regarding his personalty, the Plaintiffs failed to show the necessary fraudulent intent required to preclude discharge. For example, the Plaintiffs allege that the Debtor maintains valuable art, based upon the January, 1992 Financial Statement—which included the amount "$250,000.00" under the broad category of "Art, jewelry and collectibles".[16] The evidence reflects that Dr. Brenes owns no art of significant value, and photographs of his home, introduced into evidence, clearly support this contention. The Plaintiffs also point to the alleged concealment of jewelry owned and allegedly undervalued by the Debtor, again with reference to the broad January, 1992 Financial Statement classification of "Art, jewelry and collectibles." But the evidence presented demonstrated that virtually all the jewelry listed on the Financial Statement in question belonged to Mrs. Brenes. Similarly, the Plaintiffs allege that the Debtor has valuable household furnishings which he failed to list on his bankruptcy petition.[17] The Trustee had an appraiser visit Dr. Brenes' residence and thereafter concluded the value of the furnishing were insignificant, and elected to give notice of his intention to abandon any claim to the property. The Court has examined photographs taken by the appraiser and concludes that the Debtor's household furnishings are very modest in nature. Thus, in relation to the personalty of the Debtor, while the Plaintiffs presented evidence of inconsistent Financial Statement valuations, they failed to prove the required element of a fraudulent or false oath in connection with the bankruptcy case.[18]

*Business Interests*

The Debtor scheduled in the bankruptcy case values of several business entities in which he had an interest as zero. The Plaintiffs allege these entities owned accounts receivable and real estate which were not disclosed by this zero valuation. However, a review of the tax returns of these entities reveals that only one had equity. One entity—BSV Associates—a real estate partnership, was inadvertently shown as having a zero value when it indeed had equity. This was an oversight on Schedule B of the petition, but it was included on the amended Schedule A as an interest in real property, showing equity therein. No fraudulent intent attended any of these representations.

In further relation to BSV Associates, the Plaintiffs allege that Dr. Brenes attempted to conceal 50% of his ownership interest. Dr. Brenes is a one-third owner of BSV, as disclosed in the bankruptcy case schedule amendments. However, Dr. Brenes "believes" and maintains that he is

property as jointly owned on Financial Statements, (iii) the law in Puerto Rico, where the Debtor was raised and educated, was understood by the Debtor to be a community property jurisdiction, and (iv) the failure of the Debtor's counsel to properly conduct a title search of the property.

16. As previously noted, the June, 1992 Financial Statement was marked "N/A" in this general category.

17. The bankruptcy petition was amended to include $8000.00 of household furnishings

18. Omissions of other items from the bankruptcy schedules were made upon a good faith belief by Dr. Brenes that the items did not exist, were worthless or did not rightfully belong to him.

a one-sixth owner because the remainder of his interest belongs to his associate, Dr. Raad. Dr. Raad paid one half of the note for the purchase of the interest and has always been considered by the Debtor the owner of an proportional interest. The Debtor made a good faith effort to disclose his interest in BSV Associates, listing an ownership interest he believed appropriate at the time.

The allegation that Dr. Brenes intentionally withheld, or attempted to conceal by not scheduling, his ownership interest in AIM 2000, P.C. is also unsupported. The framework for the formation of AIM 2000, P.C. was not to involve Dr. Brenes as an officer, shareholder or director of that new entity. The inclusion of Dr. Brenes as a stockholder in AIM 2000, was an error testified to and admitted to the Debtor's counsel. The bankruptcy schedules were amended to reflect his ownership interest as soon as the error was discovered. No fraudulent intent existed on the part of the Debtor, and the errors by counsel precluded his proper disclosure of this interest, simply because he was unaware of the interest.

▮ A discharge may not be denied under 11 U.S.C. § 727(a)(4)(A) where the untruth has been the result of mistake or inadvertence. *E.g., In re Bodenstein,* 168 B.R. 23, 32 (Bankr.E.D.N.Y.1994); *In re Arcuri, supra,* 116 B.R. at 883. Furthermore, honest mistake or inadvertence does not "evince fraudulent intent within the meaning of Code § 727(a)(4)(A)." *Id.*

The Plaintiffs have failed to establish a false oath or fraud on the part of the Debtor in connection with the bankruptcy case. Through six days of trial, the Debtor established that the various omissions, misstatements or inaccuracies alleged, were unintentional and not made with fraudulent intent to conceal assets, but rather were the product of inadvertent

oversight and mistake by Dr. Brenes and/or his attorney. The objection to discharge under 11 U.S.C. § 727(a)(4)(A) should be overruled and denied.

## C. COUNT THREE—Section 727(a)(5)—No Satisfactory Explanation of Loss of Assets

The Plaintiffs' Third Claim for Relief is brought pursuant to 11 U.S.C. § 727(a)(5) upon a claim that the Debtor has failed to satisfactorily explain, before determination of the denial of his discharge, a loss of assets or deficiency of assets.

Section 727(a)(5) provides:

> (a) The court shall grant the debtor a discharge, unless—
>
> > (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5)(1995).

▮ Once a plaintiff has established the disappearance of substantial assets, the burden shifts to the debtor to satisfactorily explain the loss or deficiency. *Beneficial Mortgage Co. v. Craig (In re Craig),* 140 B.R. 454, 459 (Bankr.N.D.Ohio 1992); 7 *Collier on Bankruptcy,* ¶ 1129.03[11], pp. 1129–65 ( Lawrence P. King, ed., 15th ed. rev.1999). To be satisfactory, "an explanation" must convince the bankruptcy judge that a debtor has not hidden or improperly shielded assets. *Bodenstein,* 168 B.R. 23, 33 (Bankr.E.D.N.Y.1994). The word

> 'satisfactorily'... may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or the shortage. He is

satisfied. He no longer wonders. He is contented.

*In re Shapiro & Ornish,* 37 F.2d 403, 406 (N.D.Tex.1929), *aff'd* 37 F.2d 407 (5th Cir. 1930).

▆▆▆ Dr. Brenes signed the January, 1992 and June, 1992 Financial Statements submitted to Centerbank reflecting therein a net worth of $4,027,000.00 and $1,613,000.00, respectively, and total assets of $6,256,000.00 and $5,982,000.00, respectively. Comparison of these Financial Statements to Dr. Brenes' Bankruptcy Schedules dated February 3, 1995—which list a net worth of negative ($3,564,125.00) and total assets of $789,250.00—is facially indicative of a disturbing asset loss during this period of over $5,000.000.[19] On this basis alone, the Plaintiffs have met their initial burden of establishing a deficiency of substantial assets. However, notwithstanding the magnitude of the contradictions between the Financial Statements and the Schedules, the Court finds that the Debtor has met his burden and satisfactorily explained these discrepancies.

The starting point in this calculus is, of course, the Financial Statements and the valuations therein. In large measure, the Plaintiffs assume in their argument that the Financial Statement valuations are accurate. For example, the Plaintiffs argue, citing the Financial Statements, that the Debtor has failed to satisfactorily explain how his assets decreased from approximately $6,000,000.00 in 1992 to less than $800,000.00 on the 1995 Petition Date, and how the value of the Aruba property

dropped in value from $250,000 to $30,000 during the same period.

First, having heard and credited the testimony of Dr. Brenes this Court does not view the Financial Statements to establish the large universe of assets represented therein and argued to have "dissipated" pre-petition. Rather, the Financial Statements reflect an overstatement, perhaps even a gross overstatement, of the Debtor's pre-petition assets. The Financial Statements were prepared by Dr. Brenes acting with an intent to cast his finances in the most favorable light in connection with an attempted restructuring of the debts of the Debtor's medical practice and related businesses. In addition, although he alone signed the Financial Statements, Dr. Brenes listed both his and his spouse's assets.

Second, a line item comparison of the two Financial Statements submitted to the same financial institution shows such large discrepancies in values assigned to the same assets over a relatively short intervening period of time, that it is reasonable to infer that the numbers thereon, particularly the numbers in the January, 1992 Financial Statement, were at best preliminary "guesstimates" as Dr. Brenes testified.[20] For example, if the Financial Statements are precise and credible, then, during the first five months of 1992 alone, the market value of the Aruba Property and the Debtor's "net worth" purportedly declined in value by 40% ($100,000.00), and 60% ($2,414,000.00), respectively. If the Financial Statements are accurate reflectors of actual valuations of the Debtor's

19. Comparison of Financial Statement total liabilities of $2,229.000 and $4,369,000, respectively, to bankruptcy schedule liabilities of $4,353,375 is indicative of an even greater disparity between the Financial Statements themselves.

20. In addition to the two Financial Statements, additional financial information, including historical data and projected data on the medical practice and related businesses, tax returns and appraisals, were furnished to Centerbank beginning in 1992, through sometime in 1993.

assets in January and June, 1992, then Dr. Brenes arguably gave notice to Centerbank that the Aruba property and his net worth were depreciating at the rate of $200,000.00 and $2,414,000.00 per year, respectively. The Financial Statements are internally inconsistent, and are simply not accurate pictures of the Debtor's 1992 financial universe. They are, at best, very rough (and facially conflicting) "guesstimates" of the Debtor's 1992 financial situation.

In addition to the actual extent of the "dissipation" of prepetition assets, Dr. Brenes offered explanations for the decrease in value for each piece of real estate. The Aruba property was affected by a general real estate market crash, the underlying land was leased, not owned, the closing of a nearby refinery further depressed property values, and the property was listed at liquidation value in the bankruptcy petition. The properties in Wolcott, Connecticut, were also affected by a general real estate market crash and the use of liquidation values on the petition.[21] The Debtor explained the petition date valuation of 40 Coe Road, Wolcott, at $265,000.00 by providing an appraisal. As to the difference between the Financial Statements and the bankruptcy schedules for "art, jewelry and collectibles", Dr. Brenes never collected or owned art of any significant value. The "collectibles" consisted of Armani and Lladro figurines were owned by Mrs. Brenes, and the vast majority of the jewelry also belonged to her. In addition, most of his wife's jewelry was sold by her at the diamond center

in New York City for the purpose of raising cash to meet household expenses[22] prior to the filing of the Debtor's Chapter 7 petition.

The household furnishings included in the January, 1992 Financial Statement at $150,000.00 were listed therein at the high end of their replacement cost, but at liquidation value in the bankruptcy schedules. The Trustee, after reviewing the household furnishings of the Debtor, elected to abandon them, thereby supporting the negligible value as scheduled by the Debtor in connection with the bankruptcy case.

Business valuations included in the Financial Statements differed from those placed upon his bankruptcy schedules. However, the Debtor's medical practice and related businesses had suffered revenue losses, and in some cases had closed, due to a variety of circumstances, which included the loss of four physicians in late 1992, the abolition of no fault insurance, cost-containment measures instituted by HMO's and health insurance companies, as well as the passage of Federal legislation (Stark I and II) limiting physicians' abilities to refer patients to medical service providers in which they have interests.

Tax returns of various businesses in which the Debtor owned or owns interests show decreasing revenues over the past few years as follows:

a. Associates in Internal Medicine, P.C.—1993: $1,098,778 to 1994: $805,000 (estimated based upon 2 months actual operations totaling $134,129 until AIM 2000 began), due to

---

21. The Debtor explained the scheduling of the Offices at $1,000,000 stating that figure was taken from an appraisal obtained by a lender in a pending foreclosure action, that he had reason to believe that the value had fallen even farther, and that a number of the tenants at that property had reduced or stopped paying their rent.

22. As previously noted, the Debtor also sold his wedding in New York City at the Diamond Center, to raise cash to meet household expenses, and in response to learning of his wife's sale of her jewelry.

consolidated return filed, figures are net of CMS, Inc. portions which are displayed in paragraph c below.

b. Associates in Internal Medicine 2000, P.C.—because 1994 was a short tax year, it is more appropriate to compare the consolidated totals of 1994 AIM, Inc., whose full year estimated total equals $805,000 (see paragraph a above) plus the 1994 CMS, Inc. total of $427,388 (see paragraph d below) for a combined total of $1,232,388 with the 1995 full year of AIM 2000 operations totaling $859,048.

c. BAR Associates—1993: $686,660 to 1994: $430,955 to 1995: $153,640 (the total of rental revenue and WPT revenue).

d. Community Medical Specialists, Inc.—1992: $918,215 to 1993: $902,348 to 1994: $427,388, which for 1993 and 1994 represents the CMS, Inc. portion only of consolidated AIM, Inc. return balance (see paragraph a above).

e. Dutch Acres Racing Group VIII— 1993: $2,015 to 1994: $0.

f. Dutch Acres Racing Group IX— 1993: $785 to 1994: $0.

g. Kinetics, Inc.—1993: $548 to 1994: $-748 to 1995: $-3277.

Furthermore, the Financial Statement values reflected going-concern values while the bankruptcy petition schedules represent liquidation values, and once Dr. Brenes ceased to be involved in the entities, they were virtually worthless.

In relation to the business entities, the Plaintiffs maintain that accounts receivable listed on the Financial Statements by the Debtor, were not listed on the bankruptcy petition. First, the accounts receivable are not the property of the Debtor.[23] They are the property of the entities under which they were listed; but were inadvertently scheduled by the Debtor. Second, these accounts receivable are uncollectible based upon their ages.[24] Testimony of several witnesses corroborated the fact that accounts receivable over 120 days old are practically uncollectible. The accounts receivable in question, are over six months old, and additional testimony was heard that costs of collection of these receivables would exceed their value.

In summary, the actual value of the Debtor's assets cannot be reliably measured by reference to the 1992 Financial Statements. Whatever their value in 1992, the Debtor's assets significantly depreciated during the two year pre-petition period. To the extent an explanation of the "loss of assets" is required, the Court finds the testimony of Dr. Brenes credible and satisfactory.

## D. COUNT FOUR—Section 727(a)(2)— Transfer or Concealment of Property

The Plaintiffs' Fourth Claim for Relief is brought pursuant to 11 U.S.C. § 727(a)(2) upon a claim that the Debtor, with intent to hinder, delay or defraud a creditor or officer of the estate charged with custody of property under Title 11, transferred or concealed, or has permitted to be transferred or concealed—(A) property of the

23. The Debtor explained the omission from his bankruptcy schedules of any accounts receivables due to businesses in which he had interests by testifying that any such receivables were owed not to him, but by the businesses themselves.

24. The Debtor and Debtor's business manager further testified that given the nature of the Debtor's patient population, the collections on accounts receivables for various entities in which the Debtor has or has had interests have been largely unsuccessful, with accounts more than 60 days old being virtually uncollectible.

debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition. The Complaint alleges concealment of assets based upon omissions or inaccuracies on the bankruptcy petition schedules for various business interests, real estate ownership, jewelry, household furnishings, and receivables from various business entities.

Section 727(a)(2) states:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

■ To sustain an objection to discharge under Section 727(a)(2), a creditor must prove that the act or undertaking:

(1) occurred within one year prior to the commencement of the case;

(2) was performed with actual intent to defraud a creditor;

(3) was done by the debtor or his duly authorized agent; and

(4) involved concealing, destroying, transferring, or removing debtor's property, or permitting any of these acts to be done.

*E.g., In re Maletta, supra,* 159 B.R. at 115. *See also In re Silverstein,* 151 B.R. 657, 660 (Bankr.E.D.N.Y.1993).

In most respects Plaintiffs' allegations in the Fourth Count mirror the allegations of Plaintiffs' Second Count, with the Plaintiffs claiming that the Debtor's failure to fully and properly disclose certain matters on his bankruptcy schedules constitutes a concealment of property under 11 U.S.C. § 727(a)(2). As such, the findings of fact

regarding Plaintiffs' Second Count, *supra,* apply with equal force to the same factual allegations contained in Plaintiffs' Fourth Count.

■ Concealment of the assets, without more, is not enough to deny discharge under 11 U.S.C. § 727(a)(2); rather, there must be a showing of an actual intent to hinder, delay, or defraud creditors. *E.g., In re Bernard,* 99 B.R. 563 (Bankr.S.D.N.Y.1989.) *See also In re Koch,* 83 B.R. 898 (Bankr.E.D.Pa.1988). The Court is satisfied that Dr. Brenes did not act with the requisite intent to conceal, defraud or delay his creditors.

Certain real property omissions, claimed by the Plaintiffs to be concealment, were honest mistakes in regard to the ownership interests. For example, as previously discussed, the Debtor's contention that he was unaware of his actual ownership interest in the Atlantic City real estate was supported by the testimony of several witnesses. Moreover, there is no equity in the property which would provide a benefit to Dr. Brenes in concealing it.

The accounts receivable for various business entities claimed by the Plaintiffs to be concealed, were affirmed as worthless by several witnesses, and would provide no benefit to the Debtor in concealment. Furthermore, the disclosure of these receivables was not necessary because they are receivables of the various business entities, not of Dr. Brenes personally. And because these business entities, except one as previously discussed, have no equity the valuation of the various entities as zero was accurate.

■ The Plaintiffs' assertion that the Debtor intentionally concealed his ownership interest in AIM 2000 P.C. is without credible evidentiary support, and is contrary to the testimony of witnesses who testified that the intent in the formation of

AIM 2000, P.C., was to exclude Dr. Brenes from ownership of the entity. Counsel for the Debtor further testified that the mistake of making the Debtor a shareholder in the entity was his. The error, not discovered until after the filing of the bankruptcy petition, was later amended to reflect this interest. Reliance upon counsel can negate fraudulent intent. *E.g., In re Cycle Accounting Services,* 43 B.R. 264 (Bankr.E.D.Tenn.1984); *In re Sullivan,* 111 B.R. 317 (Bankr.D.Mont.1990). While the Debtor owned an actual interest in the corporation, the requisite intent to hinder, delay or defraud a creditor cannot spring from a mistaken omission of that interest from the Debtor's schedules. *See Barr v. Overmyer,* 121 B.R. 272 (Bankr.S.D.N.Y. 1990).

While the Debtor and his counsel made mistakes in the formulation of the bankruptcy petition there was no intent to defraud anyone. Indeed, the majority of these omissions provided no benefit to the Debtor or adversely affected any creditor. As such, the objection to discharge under 11 U.S.C. § 727(a)(2) should be denied.

### V. CONCLUSION

First, assuming, *arguendo,* that the Plaintiffs presented evidence that the Debtor failed to keep sufficient records from which a substantially complete picture of his financial condition and business transactions might be ascertained, the Debtor presented ample justification for such failure. Second, the Debtor established that various omissions and/or inaccuracies made in connection with the bankruptcy case were not made knowingly or fraudulently, but inadvertently through oversight and mistake. Third, the Debtor has provided a satisfactory explanation concerning statements made in pre-petition Financial Statements at variance with statements in connection with the bank-

ruptcy case, and has explained satisfactorily all other "losses of assets" to the extent alleged and established by the Plaintiffs. Finally, to the extent the Plaintiffs established that certain inaccuracies and/or omissions in the petition and related documents had the effect of "concealing" assets, the Debtor, in connection therewith, did not act with intent to conceal, defraud or delay his creditors. Accordingly, the objections to the Debtor's discharge based upon Bankruptcy Code Sections 727(a)(2), (3), (4) or (5) should be **OVERRULED** and **DENIED**.

This Memorandum of Decision shall constitute this Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr.P. 7052. A separate Judgment in favor of the Debtor–Defendant shall enter simultaneously herewith.