### TASTEE DONUTS, INC.

v.

### Joseph BRUNO.

### Civ. A. No. 94–0136.

United States District Court,
E.D. Louisiana.

June 13, 1994.

---

Antonio LeMon, Michael S. Guillory, PLC, Metairie, LA, for Tastee Donuts, Inc.

Merrill Thomas Landwehr, Landwehr & Hof, New Orleans, LA, for Joseph Bruno.

## ORDER AND REASONS

BERRIGAN, District Judge.

Plaintiff Tastee Donuts, Inc., appeals the Bankruptcy Court's decision dismissing its

claim. Having considered the briefs, the applicable law, and the record, the Court affirms the Bankruptcy Court for the reasons that follow.

## BACKGROUND

Marsha Brown ("Brown") and Joseph Bruno ("Debtor") on August 14, 1987, formed Brown and Bruno, Inc. ("Corporation") of which they each owned half. Tr. at 12, 36. They formed the Corporation to own and operate a Ruth's Chris Steak House franchise restaurant in Philadelphia. Tr. at 12. In September 1987, Brown and Debtor signed a Ruth's Chris franchise agreement, Tr. at 8, and two months later executed a buy-sell agreement providing that the Corporation would have the right of first refusal to purchase the shares. Tr. at 42. This buy-sell agreement had been encouraged and suggested by the franchisor. Tr. at 108.

Brown, who previously worked for the corporation that awarded Ruth's Chris franchises, and Debtor estimated that they needed $900,000 to finance the restaurant. Tr. at 11. Merchants Bank and Trust Co. loaned Brown and Debtor $905,000, which Debtor personally secured by assigning his rents and income from various businesses and property along with his interest in insurance policies, contracts, and associated income. Tr. at 11–12, 21, 23, 35. The money was not lent in a lump-sum, however; an accounting had to be made to the bank before loan monies could be drawn. Tr. at 28.

Brown and Debtor soon realized that this amount was insufficient, and Debtor executed additional security and loan documents that increased the potential loan amount to $1,405,000, all of which he personally guaranteed. Tr. at 30–35. However, all of this potential loan was not made. Tr. at 32, 40–41. The loan amount was only $1.055 million, and contractors working on the new restaurant agreed to extend credit in the amount of $350,000. Tr. at 38–40.

Brown and Debtor opened the restaurant on September 30, 1988. Tr. at 37. The business had a net loss of almost $9,000 before taxes that year. Tr. at 40–41.

According to Debtor, his financial situation became desperate when he had to pay a tax deficiency of approximately $110,000, and the Corporation's restaurant was not making money. Tr. at 40–41. Although Debtor and Bruno had what Debtor described as a "close relationship," that relationship deteriorated because of Debtor's financial problems when debtor began "taking money out of the Company" to pay other debts; he and Brown became "kind of became enemies." Tr. at 36, 48, 49.

Therefore, on December 28, 1988, the Corporation decided to acquire Debtor's one-half interest in the restaurant. Tr. at 36. Brown and Debtor hired a certified public accounting firm, Laskaris & Laskaris, that placed the acquisition cost at $86,103.27, and the Corporation issued a promissory note to Debtor for that amount on March 1, 1989. Tr. at 42–43. The promissory note provided for a payout over several years, beginning with interest payments on January 1, 1990, and principal payments on January 1, 1991. Appeal Record, Item No. 36. Debtor testified that he had no ownership interest after the stock sale. Tr. at 45–46.

Further, by January 1990, Debtor and his son moved out of the apartment they had shared previously with Brown. Tr. at 47.

After the Corporation decided to buy Debtor's shares but before the transaction was completed, the two entered into a management consulting agreement pursuant to which the Corporation paid Debtor a base fee of $1,000 a month for his services, additional compensation for various expenses, food and beverage consumed in the course of providing services, travel and lodging, and a $500 per month clothing allowance. Pl.'s Ex. 42. However, Debtor resigned his position as president of the Corporation and could not draw money from or sign checks for the Corporation. Appeal Record, Item No. 35; Tr. at 70–71. The franchisor was given knowledge of the consulting agreement and understood Debtor's duties to be in the public relations and advertising areas of the Corporation, and the franchisor's representative testified that all of the franchisor's dealings are with Brown. Tr. at 109.

On May 22, 1990, Debtor filed a Chapter 11 bankruptcy petition that was converted to a Chapter 7 proceeding. On February 20, 1991, Tastee Donuts, Inc. ("Tastee") filed an adversary complaint objecting to the discharge of Debtor from his debts pursuant to 11 U.S.C. § 727. The Bankruptcy Court dismissed Tastee's complaint after a trial, and Tastee appeals.

## ISSUES

1. Did the Bankruptcy Court err in finding that circumstances do not warrant application of the continuing concealment doctrine, an exception to 11 U.S.C. § 727(a)(2)(A)?

2. Did the Bankruptcy Court err in allowing discharge pursuant to 11 U.S.C. § 727(a)(2)(A) based on the conclusion that Debtor had no intent to defraud, hinder, or delay a creditor or officer of an estate?

## STANDARD OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

■ The clearly erroneous standard applies when examining intent to defraud in bankruptcy matters. *In re Olivier,* 819 F.2d 550, 552 (5th Cir.1987); *In re Reed,* 700 F.2d 986, 992 (5th Cir.1983). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *In re Bowyer,* 916 F.2d 1056, 1059 (5th Cir.1990), *on reh'g,* 932 F.2d 1100 (1991), (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Conclusions of law are reviewed *de novo. In re Killough,* 900 F.2d 61, 63 (5th Cir.1990).

## LAW AND DECISION

The Bankruptcy Code provides:

(a) The court shall grant the debtor a discharge, unless ...

(2) the debtor, with intent to hinder, delay, or defraud a creditor, ... has transferred, removed, ... (A) property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A).

■ Four elements are required to deny a discharge. The court must find (1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; and (4) with intent to hinder, delay, or defraud the creditor of the estate. *In re Chastant,* 873 F.2d 89, 90 (5th Cir.1989) (citations omitted).

■ The creditor bears the burden of proving that the transfer occurred with the intent to hinder, delay or defraud the creditor. *Id.* at 90–91. Evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge. *Id.* at 91 (citing *In re Reed,* 700 F.2d 986, 991 (5th Cir.1983)). Constructive intent is insufficient. *In re Chastant,* 873 F.2d at 91. Actual intent may be inferred from the actions of the debtor, however, and may be proven by circumstantial evidence. *Id.* (Citations omitted.)

■ The Fifth Circuit uses six factors to determine whether actual intent to defraud exists under § 727(a)(2)(A):

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and,

(6) the general chronology of the events and transactions under inquiry.

*Id.* (Citations omitted).

Tastee argues that Debtor's transfer of his half interest in the Corporation is governed by 11 U.S.C. § 727(a)(2)(A). However, because the transfer occurred in March 1989,

more than one year before his bankruptcy filing in May, 1990, Tastee must rely on an exception to the one-year rule, which the Court first considers.

### A. Time Period

■ As noted, 11 U.S.C. § 727(a)(2)(A) provides that the transfer at issue must occur within one year of the bankruptcy filing. However, when the concealment of an interest in an asset continues, with the requisite intent, into the year before bankruptcy it constitutes a form of concealment within reach of § 727(a)(2)(A). *In re Olivier*, 819 F.2d 550, 555 (5th Cir.1987).

Here, Debtor sold his fifty-percent ownership of stock in the Corporation to Brown, with whom he shared an apartment, about fourteen months before Debtor filed for bankruptcy. Although Debtor testified that he and Brown had a "close relationship," Tr. at 49, it is noteworthy that the stock was valued by a certified public accounting firm hired by the Corporation. Tr. at 42–43. The buy-sell agreement was also encouraged and suggested by the franchisor, not Debtor.

Debtor remained with the Corporation in a consultant capacity that included many management duties. Appeal Record, Item No. 42. He receives $1,000 per month as a consultant and additional compensation for various expenses, food and beverage consumed in the course of providing services, travel and lodging, and $500 per month for a clothing allowance. Appeal Record, Item No. 42. His monthly consultant payments from the restaurant ranged from $4,000 to $16,500. Tr. at 76–78, 82–83. However, there is no evidence that these payments were for anything other than what Debtor was due per his consultant contract with the Corporation. Further, there was no proof of concealment. Debtor testified he could not draw from or write checks for the Corporation, and Item No. 36 in the Appeal Record shows he resigned as president of the Corporation in the same correspondence in which the franchisor was given notice of plaintiff's consultant position. No inference of continuing concealment can be drawn from the existence of the consulting contract itself, especially in view of the other evidence reviewed above.

Therefore, the Court fails to find that the Bankruptcy Court clearly erred in its findings of facts or erred in its conclusion of law that the exception to the one-year period was inapplicable in this case. As the Bankruptcy Court stated, although given considerable leeway, Tastee failed to show the transfer of Debtor's stock to Brown was an effort to conceal his secretly retained interest in the venture. Although he had management-type duties under his consultant contract, Debtor retained no financial control and was only paid per the consultant contract. It is true that Debtor remained liable on the Corporation's debt, but he had assumed the debt *prior* to the stock sale, not after. The Court finds the *Olivier* exception to the one-year concealment doctrine of 11 U.S.C. § 727(a)(2)(A) inapplicable to the facts of this case.

In *Olivier* the debtors transferred title to their home to one of the debtors' mothers two days after a vehicular accident for which debtors correctly predicted they would be held liable. *In re Olivier*, 819 F.2d at 551. Yet, debtors continued to live in the same house, maintain the house, and pay insurance on the house even though they failed to pay rent on the house. *Id.* The Court of Appeals affirmed the decisions by the lower courts, which refused to discharge debtors because of the continuing concealment of their asset with the intent of hindering, defrauding or delaying the creditor, the personal-injury plaintiff, even when the bankruptcy petition was filed seven years after the vehicular accident. *Id.* at 554–555.

Similarly, the other cases cited by Tastee in support of its argument, *In re Kaufmann*, 675 F.2d 127 (7th Cir.1981), and *In re Hodge*, 92 B.R. 919 (1988), are inapplicable in view of the facts of this case.

In the present case, there has been no evidence of such concealment and/or use proven by Tastee.

### B. Intent to defraud, hinder or delay

■ Even assuming the *Olivier* exception were applicable in this case, the Bankruptcy Court did not err in failing to find actual intent on the part of the Debtor under the

*Chastant* factors. Appellant argues that Debtor transferred the stock for inadequate consideration because he personally guaranteed a $1.4 million loan yet sold his half interest for $86,000. Debtor maintains that the stock sale was legitimate because it was carried out pursuant to the Buy–Sell Agreement. The Court finds that the consideration was adequate. The stock was valued by a certified public accounting firm, and Tastee has not shown that the valuation was incorrect or that Debtor or the accounting firm acted improperly in arriving at the valuation.

In regard to the second *Chastant* factor, Tastee also argues that Brown was Debtor's live-in girlfriend at the time they began the franchise, and they maintain a close personal relationship. The court agrees that, as Debtor testified, he and Brown had a "close relationship." Debtor also testified, however, that this relationship was, at the least, strained by Debtor's financial straits. Further, Debtor even moved into a separate apartment with his son within one year of the stock sale.

Under the third factor, Tastee contends that Debtor retains a benefit from the business because the consulting agreement gives him basically the same authority and responsibility that he held before the sale. Debtor argues that the evidence shows that he does not have any remaining ownership interest in the Corporation and that he derived no benefit other than the price paid for the stock. In essence, Tastee argues that the consulting agreement was part of a sham transaction that allowed Debtor to either retain ownership interest despite the purported sale or appear to creditors that he retained an ownership interest. The Court disagrees. Debtor did not hide the fact of his remaining with the Corporation as a consultant. Appeal Record, Item No. 36. Debtor also resigned as president of the Corporation, Appeal Record, Item No. 36, and exercised no financial control over the Corporation's checkbook. Based upon this evidence, the Court finds that the Debtor did not retain possession, benefit or use of the property in question.

Under the fourth *Chastant* factor, Debtor, in fact, mortgaged or assigned most, if not all, of his personal assets to finance the restaurant. He also remained liable for those debts after he sold his interest in the Corporation. The court finds that evidence in the record of Debtor's financial condition both before and after he invested in the Corporation does not show that he had an intent to defraud, hinder, or delay his creditors.

In regard to the fifth *Chastant* factor, Debtor decided to sell his interest in the Corporation less than three months after the restaurant opened and after personally guaranteeing about $1.4 million in loans to start the business. He also entered into a consulting agreement with Brown to work for the Corporation for $1,000 per month and for various expenses that provided Debtor with between $4,000 and $16,500 in cash per month. Tr. at 76–78, 82–83. However, as noted above, the entire $1.4 million was not loaned. Further, there was no proof the payments made to Debtor pursuant to the consultant contract were for anything other than work performed pursuant to the consultant contract. Additionally, Debtor had no financial control of the Corporation, did not hide his consultant capacity and remained liable on the loan debt despite the fact that his only pay from the Corporation was per the consultant contract. The stock sale was also based on a valuation by an accountant, not by the Debtor or Brown. The Court finds that, in light of this factor, there is no inference that Debtor that had the necessary intent to defraud, hinder, or delay his creditors.

Under the sixth factor, Tastee argues that Debtor's negotiation for sale of his stock almost immediately after opening the restaurant casts doubt on the entire transaction. Debtor mortgaged and assigned most, if not all, of his assets to start the franchise after consulting with his partner who previously worked for the company that sold Ruth's Chris franchises. Tastee argues that, because research showed that the Philadelphia franchise would be successful, Debtor must have believed that his investment would be profitable. The president of the franchisor company testified that it usually takes six months for new restaurants to break even and about eighteen months to show a profit.

Tr. at 102. However, Debtor's testimony that he needed money to pay a tax deficiency is credible, as is the fact that the stock was valued by an accounting firm.

In summary, the Court finds that the Bankruptcy Court, which had the opportunity to view the witnesses, including Debtor, as well as hear their testimony, was not clearly erroneous in its factual findings. The evidence showed Debtor sold his stock for fair value and did not possess a continuing, secret interest in the Corporation's restaurant. Nor did Debtor conceal any benefits after the stock sale. Thus, Bankruptcy Court did not err in failing to find actual intent by Debtor to defraud, hinder or delay Tastee. The Bankruptcy Court's order dismissing the petition of Tastee objecting to Debtor's discharge should be affirmed.

## CONCLUSION

The Court finds that the Bankruptcy Court did not err in dismissing the petition of Tastee Donuts, Inc., which objected pursuant to 11 U.S.C. § 727(a)(2)(A) to the discharge of Joseph Bruno. Accordingly,

**IT IS ORDERED** that the judgment of the Bankruptcy Court is **AFFIRMED.**