In re George K. BOYER, Debtor.

Republic Credit Corporation
I, Plaintiff,

v.

George K. Boyer, Defendant.

Bankruptcy No. 01–32712 (LMW).
Adversary No. 03–3104 (LMW).

United States Bankruptcy Court,
D. Connecticut.

April 9, 2007.

Douglas M. Evans, Esq. Kroll, McNamara, Evans & Delehanty, LLP, West Hartford, CT, Attorney for the Plaintiff.

Gregory F. Arcaro, Esq., Brown, Paindiris & Scott, LLP, Glastonbury, CT, Attorney for the Defendant Debtor.

Patrick W. Boatman, Esq. Law Offices of Patrick W. Boatman, LLC, East Hartford, CT, Attorney for the Defendant Debtor.

### MEMORANDUM OF DECISION

LORRAINE MURPHY WEIL, United States Bankruptcy Judge.

The matters before the court are (1) the above-referenced plaintiff's ("Republic") Complaint To Deny Discharge Pursuant to 11 U.S.C. § 727(a) (A.P. Doc. I.D. No. 1, the "Complaint")[1] which seeks to deny the above-referenced debtor (the "Debtor") his discharge pursuant to 11 U.S.C. § 727(a); (2) the Debtor's Motion To Dismiss (A.P. Doc. I.D. No. 91, the "Debtor Motion"); and (3) Republic's objection to the Debtor Motion (A.P. Doc. I.D. No. 102, the "Re-

public Objection").[2] This court has jurisdiction over these matters as core proceedings pursuant to 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of the District Court (Daly, C.J.).[3] This memorandum constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### I. PROCEDURAL BACKGROUND

#### A. The Chapter 7 Case

The Debtor commenced the Case by a chapter 7 petition (the "Petition") filed on May 24, 2001. (See Case Doc. I.D. No. 1.) On his petition the Debtor listed his address as 455 Stonington Road, Stonington, CT 06378 (the "Real Property"). (See Case Doc. I.D. No. 1.) The Debtor's bankruptcy schedules (as amended, the "Schedules") contain the following relevant statements: as of the petition date (a) the Debtor owned real property a "[b]uilding [l]ot" in East Lyme, Connecticut, the "Building Lot" with a stated value of $25,000.00 (subject to a secured claim in the amount of $7,780.33) (see Case Doc. I.D. No. 4 (Amended) Schedule A—Real Property); (b) the Debtor owned personal property with a stated value of $8,152.00 (see Case Doc. I.D. No. 73 (Amended) Schedule B—Personal Property);[4] (c) there were undisputed secured claims

---

**1.** References herein to the docket of this adversary proceeding appear in the following form: "A.P. Doc. I.D. No. ___." References herein to chapter 7 Case No. 01–32712 (the "Case") appear in the following form: "Case Doc. I.D. No.___."

**2.** The Debtor Motion was filed at the conclusion of Republic's case and was taken under advisement by the court at that time.

**3.** That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings ... arising under ... Title 11, U.S.C .... or arising in ... a case under Title 11,

U.S.C....." References herein to title 11 of the United States Code or to the Bankruptcy Code are references to the same as they appeared prior to the effective date of their amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**4.** (Amended) Schedule B lists only the following personal property: miscellaneous wearing apparel; "12 year old Cartier watch received as anniversary gift;" skis; "Veterans Policy [of life insurance];" and a tax refund. (See *id.*)

against the Debtor's property in the amount of $7,780.33 (a real estate tax lien against the Building Lot) (*see* Case Doc. I.D. No. 4 (Amended) Schedule D—Creditors Holding Secured Claims); (d) there were undisputed unsecured priority claims against the Debtor in the aggregate amount of $1,442,367.84 (*see* Case Doc. I.D. No. 73 (Amended) Schedule E—Creditors Holding Unsecured Priority Claims); [5] (e) there were undisputed unsecured nonpriority claims against the Debtor in the aggregate amount of $11,463,287.53 (*see* Case Doc. I.D. No. 73 (Amended) Schedule F—Creditors Holding Unsecured Nonpriority Claims); [6] (f) the Debtor earned $2,600.00 per month in take-home pay from his occupation (in "Real Estate—Part Time") and social security [7] (*see* Case Doc. I.D. No. 1 Schedule I—Current Income of Individual Debtor(s)); and (g) the Debtor had current monthly expenses of $1,980.00 (*see id.* Schedule J—Current Expenditures of Individual Debtor(s)). The Schedules do not mention the Real Property except as the Debtor's residence.

The Debtor also filed a Statement of Financial Affairs. (*See* Case Doc. I.D. No.

73 (Amended) Statement of Financial Affairs) (the "SOFA"). Item 1 of the SOFA ("Income from employment or operation of business") states in relevant part as follows:

| AMOUNT | SOURCE (if more than one) |
|---|---|
| $14,446.20 | 2001 YTD 1–1–01 to 5–23–01 <br> 1099 Misc. income ReMax Shoreline $600.00 <br> 1099 Misc. income Birchwood Cheshire Apt. Ltd. $10,000.00 <br> W–2 Boyer Realty Management $3846.20 |
| $27,059.68 | 2000 <br> 1099 Misc. income from ReMax Shoreline $11,675.00 <br> 1099 Misc. income from Birchwood Cheshire Apt. Ltd $10,000.00 <br> W–2 from Boyer Realty Management $5384.68 |
| $23,900.00 | 1999 <br> 1099 Misc. income from ReMax Shoreline $11,700.00 <br> 1099 Misc. income from Boyer Realty Management $12,200.00 |

(*Id.*) Item 4 of the SOFA ("Suits, executions, garnishments and attachments") lists five lawsuits in the Connecticut Superior Court in Norwich and in New London in various stages of prosecution. (*See id.*) The SOFA also states that, in the year

---

**5.** Those claims included claims for federal taxes due in the aggregate amount of $1,319,021.88 ($211,408.17 of which is possible tax liability incurred by Boyer Realty Management, Inc.). (*See id.*) The remaining amount includes $117,664.40 for taxes due the State of Connecticut and $5,681.56 for a water and sewer claim held by the City of New London (which was the subject of a then-pending action in the Connecticut Superior Court). (*See id.*)

**6.** Among those claims are: (a) an undisputed claim held by Republic on a deficiency judgment rendered by the Connecticut Superior Court in the amount (not including interest and costs) of $7,908,714.42; (b) an undisputed claim held by Republic on a deficiency judgment rendered by the Connecticut Superior Court in the amount (not including interest and costs) of $497,106.21;

(c) an undisputed claim of The Cadle Company (Republic's affiliate) on a judgment in the amount (not including interest and costs) of $134,639.80; and (d) an undisputed claim of Standard Sprinkler Corp. ("Standard Sprinkler") on a judgment rendered by the Connecticut Superior Court in the amount (not including interest and costs) of $125,000.00. (*See id.*) Republic holds its judgments which arise out of foreclosure proceedings commenced in June, 1990 as ultimate assignee of the Federal Deposit Insurance Corporation. (*See* Proof of Claim No. 7 (filed by Republic); *F.D.I.C. v. Napert–Boyer Partnership*, 40 Conn.App. 434, 437, 671 A.2d 1303 (1996).)

**7.** The Debtor's SOFA reflects an additional $ 800.00 per month from a "[r]etirement check from [the] Coast Guard." (*See* SOFA, item 2.)

prior to bankruptcy, the Debtor had not made any payments or transferred any property outside of the ordinary course of the business or financial affairs of the Debtor. (*See* SOFA, item 10.)

The first meeting of creditors and the chapter 7 trustee's (the "Trustee") examination of the Debtor under oath required by Bankruptcy Code § 341 was held on June 26, 2001 and November 8, 2001. (*See* Case Docket.) The last date for filing complaints objecting to discharge originally was set for August 27, 2001. (*See* Case Doc. I.D. No. 2.) However, from time to time that date was extended on the separate motions of the Trustee, Republic and Standard Sprinkler and on stipulated orders between Republic and the Debtor. (*See* Case Docket.) Republic appears to have conducted an examination under oath (a "Rule 2004 Examination") of the Debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. (*See* Case Doc. I.D. No. 21.) Republic also appears to have conducted Rule 2004 Examinations of Kenneth Boyer (the Debtor's son) and Mary Boyer (the Debtor's second and current wife). (*See* Case Doc. I.D. Nos. 61, 62.)[8] On July 18, 2003, Republic filed the Complaint which commenced this adversary proceeding. That was the only such complaint filed in this Case. (*See* Case Docket.)

### B. *The Adversary Proceeding*

As noted above, Republic filed the Complaint on July 18, 2003.[9] The Complaint is in four counts. The First Count of the Complaint (the "First Count") seeks to deny the Debtor's chapter 7 discharge under Bankruptcy Code § 727(a)(2)(A) based upon the alleged concealment by the Debt-or of secret interests in or transfer of (as the case may be) the Real Property, the Personal Property (as defined below) and the Alleged Redirected Compensation (as defined below). The Second Count of the Complaint (the "Second Count") seeks to deny the Debtor's chapter 7 discharge under Bankruptcy Code § 727(a)(4)(A) because of the Debtor's allegedly knowing and fraudulent failure to list the alleged foregoing secret interests in or transfer of the foregoing property in the Petition, the Schedules and/or the SOFA. The Third Count of the Complaint (the "Third Count") seeks to deny the Debtor's chapter 7 discharge under Bankruptcy Code § 727(a)(3) alleging that the Debtor has "concealed, destroyed, mutilated, falsified and/or failed to keep or preserve any recorded information . . . from which the . . . [Debtor's] financial condition or business transactions might be ascertained, and specifically, but without limitation, from which an understanding can be achieved of the circumstances resulting in the disappearance of over $40 million in assets." (Complaint ¶ 34.) The Fourth Count of the Complaint (the "Fourth Count") seeks to deny the Debtor's chapter 7 discharge under Bankruptcy Code § 727(a)(5) alleging that the Debtor has failed to "explain satisfactorily . . . the loss of assets and/or the deficiency of assets to meet his liabilities, and specifically, but without limitation, from which an understanding can be achieved of the circumstances resulting in the disappearance of over $40 million in assets." (Complaint ¶ 37.)

Trial (the "Trial") on the Complaint began on August 1, 2005 and continued over eight (nonconsecutive) days to March 21,

---

8. Depositions (including that of Robert Sussler, Esq.) also appear to have been conducted by Republic in the adversary proceeding.

9. The Debtor filed his Amended Answer and Affirmative Defenses on September 29, 2003 contesting certain key elements of the Complaint.

2006 when it was completed. (*See* A.P. Docket.) [10] The matters were taken under advisement at the conclusion of the Trial subject to post-trial briefing which now is complete.

## II. *FACTS* [11]

After a thirteen-year active-duty career with the Coast Guard,[12] the Debtor returned to civilian life in 1961 and became a licensed real estate broker in Connecticut. The Debtor had four children by a first wife: Kim Boyer; Sandra Boyer; Kathy Keller and Kenneth Boyer. The Debtor was divorced in the early 1980's and was married to his current wife, Mary Boyer, on October 1, 1983. Mary Boyer had three young children at that time.[13]

Three months before his marriage to Mary Boyer, the Debtor became record owner of the Real Property.[14] After the Debtor's remarriage, he, Mary and her children moved into the guest house at the

Real Property while she and the Debtor renovated the main house.[15] On May 24, 1984, the Debtor deeded the Real Property to himself and Mary Boyer by Warranty Deed in Survivorship. (*See* Republic Exh. DD.) [16]

In November, 1987, the Debtor and Mary Boyer took out a $ 1,000,000.00 mortgage loan (the "Condo Purchase Mortgage") on the Real Property. (*See* Republic Exh. GG.) They used the proceeds of that loan to purchase jointly a condominium (the "Condominium") on East 85th Street in Manhattan, New York. (*See* Republic Exh. PP.) On March 2, 1989, the Debtor and Mary Boyer executed and delivered a warranty deed to Mary Boyer, effectively conveying to her (subject to the Condo Purchase Mortgage) the Debtor's remaining one-half interest in the Real Property. (*See* Republic Exh. HH.) That deed was recorded on March 7, 1989. (*See id.*) [17] It appears that the Real Property

---

**10.** Copies of the transcripts of those eight days of proceedings are in the record as A.P. Doc. I.D. Nos. 84 (August 1, 2005), 85 (August 22, 2005), 86 (September 6, 2005), 88 (September 20, 2005), 87 (September 27, 2005), 98 (November 7, 2005), 99 (November 8, 2005) and 100 (March 21, 2006). Pagination is continuous (on a temporal basis) from the first transcript to the last. Accordingly, reference to any of the transcripts appears in the following form: "Transcript at—." Reference herein to trial exhibits of the respective parties appear in the following form: "Republic Exh." or "Debtor Exh.," as the case may be.

**11.** The facts found below and elsewhere in this memorandum of law are taken from the record of this adversary proceeding and/or from the entire record of the Case.

**12.** The Debtor quit high school in 1948 and enlisted in the Coast Guard.

**13.** The Debtor, Mary Boyer and Kenneth Boyer sometimes are referred to herein collectively as the "Boyers."

**14.** It appears that the Debtor paid somewhere between $635,000.00 and $750,000.00 for the

Real Property. (*See* Transcript at 78–80 (testimony of the Debtor).) It appears that the Debtor financed his purchase at least in part with the proceeds of a $250,000.00 mortgage from New London Federal Savings and Loan Association. (*See* Republic Exh. BB.) That mortgage was released of record by a document dated October 22, 1984. (*See* Republic Exh. CC.)

**15.** At certain times subsequently the guest house has been rented out and the rent proceeds used to pay taxes and insurance with respect to the Real Property. (*See* Transcript at 73, 76 (testimony of the Debtor), 398 (testimony of Mary Boyer).)

**16.** That deed was recorded in the Stonington Land Records on January 8, 1985. (*See id.* (recorded copy of deed).) That transfer is not under attack here.

**17.** By a deed recorded July 19, 1993, the Real Property was transferred to Mary C. Boyer as trustee of the Stonington Road Realty Trust. (Republic Exh. NN.) Beneficial ownership of the Stonington Road Realty Trust (which was created by a Declaration of Trust dated June

was worth between $1,200,000.00 and $1,400,000.00 at that time. (*See* Transcript at 117–18 (testimony of the Debtor).) At about the same time, the Debtor and Mary Boyer effectively conveyed to Mary Boyer the Debtor's one-half interest in the Condominium. (*See* Republic Exh. QQ.)[18] In addition, at about the same time, the Debtor executed and delivered a letter addressed to Mary Boyer which letter provided in relevant part as follows:

> At the instructions of Bob Sussler in the preparation of our Estate Plan, I am drafting this letter. I am giving to you all of my interest, if any, in all of the furniture, furnishings and other household contents of the ... [Real Property] owned by you ..., including, without limitation all antiques, collectibles, furniture, oriental rugs, art work, silver, ivory collections and all your jewelry.
>
> For the consideration of One Dollar ($1.00) and other good and valuable consideration received by me, the Seller, to my full satisfaction.
>
> I do this also for the love, affection, kindness and understanding you have brought to my life.

(Republic Exh. V, the "Gift Letter".) The Gift Letter also bears the signature of Kenneth Boyer (the Debtor's son from his first marriage) as "witness[ ]." (*See id.*)[19] In December, 1991, the Debtor and Mary Boyer took out a one-year loan from New England Savings Bank in the original principal amount of $50,000.00. (*See* Republic Exh. II, Schedule B.) That loan was secured by a mortgage (the "1991 Mortgage") on the Real Property. (*See* Republic Exh. II.) The Debtor was a nominal and/or pro forma party to the 1991 Mortgage. (*See id.* (mortgage executed by the Debtor and Mary Boyer).)

In January, 1994, Mary Boyer, as trustee of the Condo Trust, caused that entity to grant a mortgage (the "First Condo Mortgage") on the Condominium to secure a $500,000.00 obligation owed by the Debtor to Rhode Island Hospital Trust, N.A. (*See* Republic Exh. SS.) In September, 1994, Mary Boyer as trustee of the Condo Trust caused that entity to grant another mortgage (collectively with the First Condo Mortgage, the "Condo Mortgages") on the Condominium to secure a $300,000.00 obligation owed by the Debtor to The Norwich Savings Society. (*See* Republic Exh. TT.) The Condominium was sold in 1996. (Transcript at 348 (testimony of Mary Boyer).) The Condo Mortgages were satisfied in the course of that sale. (Transcript at 388 (testimony of Mary Boyer).) The $1,283,721.22 in net proceeds generated by the sale was paid to Mary Boyer. (Transcript at 356 (testimony of Mary Boyer).) Of those funds, $683,597.69 was used to pay off a 1992 refinancing of the Condo Purchase Mortgage on the Real

10, 1993) was vested in Mary C. Boyer, General Partner of the Stonington House Limited Partnership. (Republic Exh. MM.) Upon creation of the Mary C. Boyer Living Trust (the "Living Trust") by a document dated June 15, 1998 (Republic Exh. UUU), Mary Boyer assigned all of her interest in the Stonington House Limited Partnership to herself as trustee of the Living Trust. (*See* Republic Exh. XXX.)

18. In June, 1993, Mary Boyer transferred the Condominium to herself as "Trustee of 30 East 85th Street Realty Trust" [the "Condo Trust"]. (*See* Republic Exh. RR.) A limited partnership with Mary Boyer as general partner appears to have been the beneficiary of the Condo Trust. (*See* Republic Exh. EEEE, FFFF and GGGG.)

19. The personal property within the purview of the Gift Letter is referred to hereafter as the "Personal Property." Because it makes no difference to the result, it is assumed (but not adjudicated) herein that all the Personal Property previously was owned by the Debtor.

Property. (*See id.* at 356–57).[20]

■ It is uncontested that prior to the 1989 transfers discussed above, the Debtor was a wealthy man with a substantial part of his wealth composed of leveraged real property assets. For example, according to an unaudited financial statement compiled for the Debtor by Martin Gottesdiener & Company as of November 30, 1987, the Debtor had a net worth of $20,661,088.00 with furniture, antiques, art and jewelry worth $2,100,000.00 (*See* Republic Exh. P.) According to an unaudited financial statement compiled by Martin Gottesdiener & Company for the Debtor as of April 30, 1989 (Republic Exh. Q, the "April 1989 F/S"), the Debtor had a net worth of $9,635,922.00 as of that date even after the 1989 transfers of the Real Property, the Condominium and the Personal Property. (*See id.*) The April 1989 F/S was "brought forward" to October 6, 1989 under cover of a letter from the Debtor to The Connecticut Bank and Trust Company, N.A. showing "updated changes" which reduced the Debtor's net worth by almost one-half. (*See* Republic Exh. R.) According to an unaudited financial statement compiled by Martin Gottesdiener & Company for the Debtor as of December 31, 1989, the Debtor had a net worth of $310,751.00 as of that date. (*See* Republic Exh. S, the "December 1989 F/S.") The December 1989 F/S was "brought forward" to May 17, 1991 by a letter from the Debtor bearing that date and stating "I

presently have a zero to minus net worth." (Republic Exh. S.)[21]

From some time in 1984 through to the present, the Debtor has lived with Mary Boyer at the Real Property. At no time did Mary Boyer place restrictions on his right to do so. During that period, the Debtor made payments on the Real Property mortgages (while they were outstanding) and made some contributions towards property expenses (*e.g.,* electricity and heating fuel, telephone, taxes, insurance, maintenance). (*See* Transcript at 110–12 (testimony of the Debtor); Transcript at 342 (testimony of Mary Boyer); Republic Exh. A (Schedule J).) Similarly, at all relevant times the Debtor could use, view and/or otherwise enjoy the Personal Property in ordinary course without restriction. After 1991, Mary Boyer from time to time sold certain of the Personal Property and she and the Debtor "lived" on the proceeds. (Transcript at 307 (testimony of the Debtor); *see also* Transcript at 421–25 (testimony of Mary Boyer).) Pursuant to a discovery order of this court (*see* A.P. Doc. I.D. No. 44), Mary Boyer caused an inventory to be prepared of personal property having a value of $1,000.00 or more (by item or set) and then located at the Real Property. (*See* Republic Exh. HHHH.) The aggregate value stated on such inventory (not including Mary Boyer's jewelry) is about $180,000.00. (*See id.*) Republic does not stipulate to such value.

**20.** Mary Boyer paid the Condo Purchase Mortgage down by about $300,000.00 and refinanced that mortgage in the paid-down amount in 1992. (*See* Transcript at 400) (testimony of Mary Boyer). The record is unclear as to the status of the 1991 Mortgage at the time of the 1996 Condominium sale. However, it is a fair assumption that the underlying debt had been satisfied at the end of its one-year term.

**21.** The court takes judicial notice that the real estate market experienced a steep downturn in the late 1989/early 1990 time frame. *See, e.g., Hirsch v. Steinberg (In re Colonial Realty Co.),* 226 B.R. 513, 516 (Bankr.D.Conn.1998) ("In late 1989 and early 1990, . . . real estate prices fell. . . .").

The Debtor has been employed by Remax Shoreline, LLC ("Remax Shoreline") since some time in 1999 as a real estate "agent." (*See* Transcript at 718–19 (testimony of Kenneth Boyer).) Kenneth Boyer is the sole managing member of Remax Shoreline. (*See* Transcript at 718 (testimony of Kenneth Boyer).) Initially, the Debtor worked on a commission basis. (*See* Transcript at 144 (testimony of the Debtor).) Some time prior to May, 2000, the compensation arrangement between Remax Shoreline and the Debtor changed and the Debtor became a salaried employee. (*See* Transcript at 147 (testimony of the Debtor).) Republic claims that such change was a device intended to allow Remax Shoreline (or one or more other entities owned or controlled by Kenneth Boyer) to undercompensate the Debtor on its/their books for personal services rendered while paying additional compensation due the Debtor in respect of such services to Mary Boyer under the guise of wages.[22] In 2000, Mary Boyer received $30,500.00 from one or more entities (the "Boyer Entities") owned or controlled by Kenneth Boyer. (*See* Transcript at 323–24 (testimony of Mary Boyer).) Mary Boyer received from one or more of the Boyer Entities $72,800.00 in 2001 and $39,200.00 in 2002. (*See* Transcript at 324 (testimony of Mary Boyer).) It is uncontested that none of the foregoing payments were for personal services performed by her. The Boyers claim that the foregoing payments had nothing to do with the Debtor's services and related only to a separate business loan arrangement between Mary Boyer and Kenneth Boyer.

22. Such additional compensation (if any) paid in the year prior to bankruptcy is referred to hereafter as the "Alleged Redirected Compensation."

23. This point was raised by the Debtor in his answer brief (A.P. Doc. I.D. No. 103, the "Answer Brief") and was not disputed by

## III. *ANALYSIS*

Republic failed to address the Third Count in its trial brief (A.P.Doc.I.D. No. 101). Accordingly, Republic is deemed to have abandoned that claim. *See Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 828 F.Supp. 1114, 1129 (S.D.N.Y.1993), aff'd, 32 F.3d 690 (2d Cir.1994).[23]

By stipulation (the original of which is in the record as Debtor Exh. 3), the parties have limited the scope of the Fourth Count to the furniture, antiques, artwork and jewelry that was listed by the Debtor on Republic Exhs. N, O and P. The Gift Letter explains what happened to all or substantially all of those assets: the Debtor gave them (or such as were his) to Mary Boyer in 1989. Accordingly, the court finds for the Debtor on the Fourth Count.[24]

More detailed analysis is required with respect to the First Count and the Second Count and is set forth below.

### A. *Standards*

### 1. *Bankruptcy Code § 727(a)(2)(A) and "Continuing Concealment" (First Count )*

Bankruptcy Code § 727(a)(2) provides in relevant part as follows:

(a) The court shall grant the debtor a discharge, unless

. . .

 (2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed,

Republic in its reply brief (A.P. Doc. I.D. No. 106, the "Reply Brief").

24. The foregoing explanation was raised by the Debtor in the Answer Brief and was not disputed by Republic in the Reply Brief.

mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-

(A) property of the debtor, within one year before the date of the filing of the petition. . . .

11 U.S.C.A. § 727(a)(2)(A) (West 2005). "[G]iven that the denial of a debtor's discharge 'imposes an extreme penalty for wrongdoing,' Section 727 'must be construed strictly against those who object to a debtor's discharge and liberally in favor of the . . . [debtor].'" *Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R. 552, 557 (Bankr. D.Conn.2004) (Dabrowski, J.) (quoting *In re Chalasani*, 92 F.3d 1300, 1310 (2d Cir. 1996)). The plaintiff in a proceeding under Section 727(a) must prove his case by a preponderance of the evidence. *See id.* at 558.

A denial of discharge under § 727(a)(2)(A) requires that the movant prove by a preponderance of the evidence the following four elements: "(1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) his or her property, (3) within one year of the bankruptcy petition's filing, (4) with the intent to hinder, delay, or defraud a creditor." *Rhode Island Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (1st Cir. BAP1999). The courts have developed the

"continuing concealment" doctrine to bring within the ambit of § 727(a)(2)(A) certain acts that were performed prior to the one-year period. "The doctrine is most commonly invoked . . . when a debtor, prior to the year before bankruptcy, has transferred property but has secretly held something back, and has concealed that secret interest in the months immediately preceding bankruptcy." *Id.; Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 554–55 (5th Cir.1987). A concealment made with the requisite intent, prior to the one-year period does not satisfy per se the statutory requirements of recent concealment and improper intent, but "may provide circumstantial evidence of concealment activity and fraudulent intent within that year." *In re Hayes*, 229 B.R. at 260; *Rosen v. Bezner*, 996 F.2d [1527, 1533 (3d Cir.1993) ] . . . . [T]he continuing concealment doctrine must not be used to "short circuit" the § 727(a)(2)(A) analysis, as the doctrine's proper scope is limited to being an "exception to the one-year rule." *In re Hayes*, 229 B.R. at 260 (quoting *Tastee Donuts, Inc. v. Bruno*, 169 B.R. 588, 592 (E.D.La.1994)); *see also Small v. Bottone (In re Bottone)*, 209 B.R. 257, 262 (Bankr.D.Mass. 1997) (warning that by using the continuing concealment doctrine "one runs the risk of becoming distracted from the task of establishing the essential elements of a case under § 727(a)(2)(A)").

*Rowlands v. Fraser (In re Rowlands)*, 346 B.R. 279, 282–83 (1st Cir. BAP 2006) (first alteration in original). "[T]he party objecting to discharge must . . . prove an improper subjective intent during the year before bankruptcy in order to succeed." *Rosen*, 996 F.2d at 1533. *See also Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000) (concluding that "subjective intent on the debtor's part to hinder, delay or defraud a creditor" must be proven); *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir.1997) (same). In addition, the creditor must prove that the debtor concealed (with the requisite intent existing within the statutory one-year period) a property interest recognized under applicable local law. *Rosen*, 996 F.2d at 1532 n. 5, 1533; *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 696

(Bankr.S.D.N.Y.1996).[25] *See also Thompson v. Eck,* 149 F.2d 631, 633 (2d Cir.1945) ("[T]he bankrupt must have some legal interest in the property before he can be charged with its concealment.").

■ The ultimate burden to prove a "continuous concealment" with the requisite intent lies with the plaintiff. *First Federated Life Ins. Co. v. Martin (In re Martin),* 698 F.2d 883, 887 (7th Cir.1983). However, at some point(s) in the Section 727(a) proceedings, the burden of production may shift to the debtor. *See id. See also In re Martin,* 554 F.2d 55, 58 (2d Cir.1977) (stating in a case under Section 14(c)(2) of the prior Bankruptcy Act that "[r]egardless where the ultimate burden of persuasion lies, assignment of the initial burden of production depends on the circumstances." (footnote omitted)). For example, proof of a transfer of property with subsequent use by the debtor is sufficient to shift the burden to the debtor to come forward with a credible explanation of his actions. *See Martin,* 698 F.2d at 888. *Cf. Rosen, supra* (determining that proof of transfer of property with subsequent use by the debtor was not sufficient to support entry of summary judgment for the trustee because the debtor should have been permitted to testify as to his intent and surrounding circumstances).

Rarely, if ever, does a debtor admit to intentionally hindering, delaying or defrauding his creditors. Consequently, courts must often look to various "badges of fraud" to infer at illicit intention. "Badges" which are strong indicators of a debtor's illicit intent in a diversion/concealment scenario include the following:

(1) family or close relationship between the participants;

(2) lack of consideration for the property diverted;

(3) enjoyment of possession for use and benefit;

(4) financial condition of the debtor before and after the diversion;

(5) cumulative effect of transactions and course of conduct after financial difficulties arise; and

(6) general chronology and timing of events.

*Ogalin,* 303 B.R. at 558. *See also Xerox Fin. Servs. Life Ins. Co. v. Sterman (In re Sterman),* 244 B.R. 499, 504 (D.Mass.1999) ("Bankruptcy judges have sometimes inferred actual intent from the existence of 'badges of fraud,' for which no adequate rebuttal or explanation is evident."). "As with other aspects of the evaluation of evidence, determinations concerning fraudulent intent are questions of fact that depend largely upon an assessment of the credibility and demeanor of the debtor." *Id.* at 504–05 (internal quotation marks omitted).

### 2. Bankruptcy Code § 727(a)(4)(A) (Second Count)

Bankruptcy Code § 727(a)(4) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

. . .

■ (4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account. . . .

---

**25.** So we turn to the issue of whether the debtor concealed a property interest in the trust. Congress has generally left the determination of property rights in the assets of a debtor's estate to state law. [P]roperty interests are created and defined by state law. . . .

*Id.* at 696 (citing *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). Cf. 11 U.S.C. § 727(a)(2) (concealment must be of "property" of the debtor).

11 U.S.C.A. § 727(a)(4)(A) (West 2005). In order to deny discharge under Section 727(a)(4)(A), the plaintiff must establish by a preponderance of the evidence that: (1) the debtor made the statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the statement was made with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Casa Investments Co. v. Brenes (In re Brenes)*, 261 B.R. 322, 329, 334 (Bankr.D.Conn.2001) (Dabrowski, J.). Statements made by a debtor on his petition and schedules fall within the purview of Section 727(a)(4)(A) as statements made under oath. *Brenes*, 261 B.R. at 334. Omissions as well as affirmative misstatements qualify as false statements for Section 727(a)(4)(A) purposes. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992) (quoting 4 *Collier on Bankruptcy* ¶ 727.04[1], at 727–59 (15th ed.1992)).[26]

A statement is deemed to be made with knowledge of its falsity if it was known by the debtor to be false or if it was made with reckless disregard for the truth. *D.A.N. Joint Venture, L.P. v. Cacioli (In re Cacioli)*, 285 B.R. 778, 784 (Bankr. D.Conn.2002) (Dabrowski, J.), *aff'd*, 332 B.R. 514 (D.Conn.2005), *aff'd*, 463 F.3d 229 (2d Cir.2006). Since a plaintiff rarely can produce direct evidence of fraudulent intent, a court may infer fraudulent intent from circumstantial evidence. *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 575 (Bankr.N.D.Ill.2000). "[A] court may infer fraudulent intent under Code § 727(a)(4)(A) from a debtor's reckless indifference to or cavalier disregard for the truth." *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 112 (Bankr.

D.Conn.1993) (Shiff, J.) (citation omitted). A court may also infer fraudulent intent from a "pattern of concealment." *Senese*, 245 B.R. at 575. Where persuasive evidence of a false statement under oath has been produced by a party, the burden shifts to the debtor to prove that the statement was not "intentionally false." *Maletta*, 159 B.R. at 112. *See also Brenes*, 261 B.R. at 334. Fraudulent intent then may be inferred if the false statement is not satisfactorily explained. *Maletta, supra* at 112. "[A] determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor...." *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir.1987).

**B. Application of Law to Fact**

**1. Real Property and Personal Property**

**a. First Count**

For the reasons discussed below, the court is not persuaded that Republic has satisfied the intent requirement of Section 727(a)(2).

Republic suggests that the Debtor foresaw the collapse of his real estate business at the time of the 1989 transfers of the Real Property, the Personal Property (and the Condominium) and effectuated those transfers to shield his remaining assets from his creditors. On the other hand, the Debtor testified that he believed that his real estate business remained on a sound footing at the time of the 1989 transfers. (*See* Transcript at 51, 113 (testimony of the Debtor).) The Debtor further testified that the 1989 transfers were

26. With respect to materiality to the bankruptcy case, this court accepts the following formulation: "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984).

undertaken on the advice of counsel (Attorney Robert Sussler) as the initial step of an "estate plan." (See Transcript at 132, 134–35) (testimony of the Debtor). The court had the opportunity to observe the Debtor on the stand over several days and to assess his credibility. The court finds the Debtor (and, in fact, all the Boyers) to be credible witnesses. Moreover, the Debtor's testimony as to an "estate planning" motive (and not a fraud motive) for the 1989 transfers is corroborated by the testimony of Attorney Sussler.[27] (See Transcript at 860–63, 871–77) (testimony of Attorney Sussler).[28] Accordingly, the court credits the Debtor's explanation of the intent behind the 1989 transfers. Given that the court is not persuaded that the requisite intent existed with respect to and at the time of the 1989 transfers, the court is unpersuaded on this record that there was fraudulent intent within the statutory one-year period (about eleven years later.)

### b. Second Count

The court also is unpersuaded that Republic has proved the intent required by Section 727(a)(4).

■ Republic argues that the Debtor made a false oath by failing to list the Real Property and/or the Personal Property in the Petition, the Schedules and/or the SOFA. Whether or not the Debtor had any interest in those assets to disclose was at worst a litigable issue. The court finds that, at all relevant times, the Debtor subjectively believed that he had no interest in the Real Property and the Personal

Property. Moreover, the Trustee in this case found Republic's position that the Debtor did have such an interest to be meritless. See In re Boyer, 354 B.R. 14, 34–35 (Bankr.D.Conn.2006) (appeal pending). Given all of the foregoing, it cannot be said that any failure of the Debtor to list the Real Property or the Personal Property on his Schedules or SOFA was done with knowledge of falsity or in reckless disregard of the truth.

### 2. Alleged Redirected Compensation

■ For the reasons set forth below, the court is not persuaded that the challenged payments to Mary Boyer ever were due to the Debtor. Accordingly, both the First Count and the Second Count fail with respect to the Alleged Redirected Compensation.

At the Trial, Mary Boyer and/or Kenneth Boyer gave the following explanation for the challenged payments. In 1999, an investment property in the Boyer portfolio was about to be foreclosed upon by either the Resolution Trust Corporation or the Federal Deposit Insurance Corporation (collectively, the "FDIC"). (See Transcript at 795 (testimony of Kenneth Boyer); see also Transcript at 241–42 (testimony of the Debtor).) Kenneth Boyer negotiated an arrangement with the FDIC whereby the FDIC would accept $950,000.00 in full satisfaction of the subject mortgage loan provided that payment was received by a date certain. (See id. at 796 (testimony of Kenneth Boyer).)[29] As

---

27. Portions of Attorney Sussler's sworn deposition testimony was read into the record at the Trial. (See Transcript at 864 et seq.)

28. Attorney Sussler appears also to have been a family friend. (See Transcript at 133–34 (testimony of the Debtor).) However, the court declines to discredit Attorney Sussler's sworn testimony on that basis alone, and

finds his testimony otherwise to be credible in all relevant respects.

29. I don't remember it exactly, but I believe that it was maybe 45 to 60 days. It was a very short time period. And there was [sic] no extensions or options to extend. It was time is of the essence.
Id. at 797:21–24. As an additional condition to the workout, the FDIC required the Debtor

a condition to allowing Kenneth Boyer some time to attempt to obtain the necessary financing, the FDIC demanded a non-refundable deposit (the "Deposit") of $95,000.00. (Transcript at 797, 799 (testimony of Kenneth Boyer).) Kenneth Boyer borrowed the amount of the Deposit from Mary Boyer. (*Id.* at 799.) Because the loan was so risky, Kenneth Boyer agreed that he would repay the original $95,000.00 upon closing the refinancing plus compensation for the loan equal to 150% of $95,000.00 (*i.e.,* an additional $142,500.00) over time. (*See id.* at 801; *see also* Transcript at 621 (testimony of Mary Boyer).) Mary Boyer directed that the latter payments be made in the form of wages so that her health insurance would continue. (*See id.*)[30] The foregoing loan arrangement may or may not have been reduced to writing.[31] Kenneth Boyer had borrowed money for business purposes from Mary Boyer from time to time;[32] those loans were not always evidenced by a writing. (*See* Transcript at 499 (testimony of Mary Boyer); Transcript at 802–03 (testimony of Kenneth Boyer).)

Mary Boyer lent the amount of the Deposit and Kenneth Boyer was able to obtain the requisite additional financing to pay off the FDIC. (*See* Transcript at 801 (testimony of Kenneth Boyer).) Mary Boyer was repaid the $95,000.00 at or closely contemporaneous with the closing. (*See id.*) The $142,500.00 was paid to Mary Boyer in the form of bi-weekly payroll checks issued in 2000, 2001 and 2002. (*See id.* at 802.)

The foregoing arrangement may have been unorthodox. However, that does not mean that it did not exist. As noted above, the court found both Mary Boyer and Kenneth Boyer to be credible witnesses. Moreover, there is the corroborating fact that the $142,500.00 paid to Mary Boyer as wages from 2000 to 2002 was exactly 150% of $95,000.00. Accordingly, the court credits the explanation of Mary Boyer and Kenneth Boyer and finds that the challenged payments were not disguised (and/or concealed) compensation to the Debtor.

### 3. *Other Claimed Concealments/Non–Disclosures*

Republic argues further as follows:

[T]he Debtor also failed to disclose his ownership interest in certain items [collectively, the "Other Items"] that he never transferred and owned at the time of the bankruptcy filing. These include the six-panel Japanese wall hanging, 28 figurines carved in ivory, and Mill House items ... as well as some of the paintings by Louis Bonamarte, including Watch Hill Light, which was valued at $10,000.00.

(A.P. Doc. No. 101 at 29.)

To the extent that the foregoing refers to the Personal Property (*i.e.,* personal property within the purview of the Gift Letter) (or proceeds of such property) the

---

to assign his partnership interests in the relevant entity to Kenneth Boyer. (*See* Transcript at 241–42 (testimony of the Debtor).)

30. The payor Boyer Entity paid health insurance premiums and payroll taxes on the payments and reported the payments as wages to the taxing authorities. (*See id.* at 819–20 (testimony of Kenneth Boyer).) The propriety of the foregoing under non-bankruptcy law is not before the court.

31. Mary Boyer testified that there was no writing. (*See* Transcript at 499.) Kenneth Boyer was not sure but, in any event, had searched for but could not locate a note. (*See* Transcript at 804–05.)

32. Mary Boyer had some real estate background. (*See* Transcript at 315–16 (testimony of Mary Boyer).)

**48**

discussion set forth in part III.B.1.a. and b. applies. To the extent that Republic's argument does not refer to the Personal Property or its proceeds (*i.e.*, relates to personal property acquired by the Debtor after the Gift Letter or not within its purview because not then located at the Real Property), it is beyond the theory of the Complaint which is limited to personal property within the purview of the Gift Letter. (*Cf.* A.P. Doc. I.D. No. 1 ¶¶ 12–14, 25–28.) Proof with respect to the Other Items reasonably could have been construed to be proof with respect to the theories of the Complaint. Accordingly, the court declines to conform the Complaint to the evidence. *Cf. United States v. 890 Noyac Rd.*, 945 F.2d 1252, 1257 (2d Cir.1991). Moreover, even if Republic had pled the existence of such allegedly concealed personal property in the Complaint (which it did not), the court is not persuaded on this record of the existence of the intent required by Section 727(a)(2) or Section 727(a)(4) (including reckless disregard of the truth) with respect to any extant interest in the Other Items. Accordingly, the First Count and the Second Count fail with respect to the Other Items.

## IV. *CONCLUSION*

For the reasons discussed above, judgment shall enter for the Debtor and a discharge shall be issued in this case. The Debtor Motion and the Republic Objection are moot.